## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                    )
**MARIA FOURNIER,**                 )
                                    )
        **Plaintiff,**              )        **Civil Action No.**
                                    )        **18-10865-FDS**
        **v.**                      )
                                    )
**COMMONWEALTH OF**                 )
**MASSACHUSETTS, EXECUTIVE**        )
**OFFICE OF THE TRIAL COURT, LEWIS**)
**SPENCE, JOHN BELLO, and JONATHAN**)
**WILLIAMS,**                       )
                                    )
        **Defendants.**             )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is a lawsuit alleging retaliatory dismissal in violation of Title VII, 42 U.S.C. §

2000e-2, and the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185.

Plaintiff Maria Fournier was Director of Support Services at the Executive Office of the

Trial Court in Massachusetts. In that role, she oversaw various services within the Trial Court

system, including law libraries, court transcription, and the Office of Court Interpreter Services.

In January 2017, an outside consultant was hired to assess the performance of the Office

of Court Interpreter Services. The consultant undertook that review, in large part, by

interviewing staff and judges. He presented his findings to management on March 17, 2017.

Those findings were extremely critical of Fournier and noted a near-universal

dissatisfaction with her interpersonal and management skills. Among other things, she was

criticized for her "inability to delegate," "poor communication with staff & field," and "highly

reactive & defensive behavior."  Interviewees were quoted as saying things such as "[s]he [has] turned in[to] a monster" and "resorts to bullying tactics and manipulation"; "[t]here is no rhyme or reason to anything she does"; and "[s]he lies."  Various individuals referred to her as "bullish," "hostile," "inconsistent," and "overwhelmed."  The consultant recommended that management either "relaunch" her to improve her performance or remove her from her position.

That presentation was made on Friday, March 17.  The next day, Fournier's supervisor, Lewis Spence, left for vacation.

On March 30, Fournier heard a report at a staff meeting that an interpreter had made a discriminatory remark.  That day, she reported the remark to the Director of Human Resources.

The next day, March 31, Fournier met with Spence, who by then had returned from his vacation.  Spence discussed her performance and behavior issues, as reported by the consultant, and discussed whether she should be terminated, demoted, or transferred.  Fournier said that she would consider the options and get back to him.  She did not, however, provide a substantive response to Spence at any point over the next two weeks.

Two weeks later, on April 14, Spence placed Fournier on administrative leave.  The next day, he retired.

Eventually, on August 15, 2017—after a hearing and an internal investigation—Fournier was terminated.  The termination decision was made by Jonathan Williams, Spence's successor, who had started his position in May 2017.

The amended complaint asserts claims for retaliation in violation of Title VII and the Massachusetts Whistleblower Act.  The retaliation case is premised heavily on what Fournier says is the close proximity between her protected activity on March 30 and the adverse employment event, which she says occurred during the meeting with Spence on March 31.

According to her, that close proximity, together with the other evidence, is sufficient to infer a strong causal relationship and establish that defendants' stated justification for her termination was pretextual.

The retaliation case is problematic in multiple respects, beginning with the consultant's findings concerning her workplace performance. That performance, as reported, was not merely unsatisfactory or subpar; co-workers described her in scathingly critical terms. It is of course entirely possible that the criticisms were inaccurate or unfair. But there is overwhelming evidence that management had a legitimate, non-retaliatory basis for her discharge.

Furthermore, the temporal proximity on which Fournier relies is not nearly as close as she suggests. She was not, in fact, terminated the day after her protected activity, or indeed at any time over the ensuing four and one-half months. She was terminated on August 15, and then only after a hearing and an internal investigation into the retaliation issue. Nor was she terminated by the person with whom she met on March 31 (Spence), but by a different person altogether (Williams). And the circumstances of the protected activity also undercut an inference of retaliation. Fournier herself did not hear the alleged discriminatory remark; she heard about it second-hand at a staff meeting. She (commendably) passed along what she had heard to senior management. But so did another person who was present at the meeting. That person suffered no retaliation, and indeed was subsequently promoted.

Fournier attempts to buttress her case with other claims, including the inflammatory and unsupported claim that Spence is an "admitted" racist. She also claims that she was subject to disparate treatment compared to other employees and that the key decisionmakers engaged in various forms of inappropriate conduct, including lying in their depositions, providing shifting explanations for her termination, and failing to follow established procedures. Many of those

claims are based on gross distortions of the evidentiary record, and others are immaterial. In the end, even viewing the evidence in the light most favorable to plaintiff, and drawing reasonable inferences in her favor, there is insufficient evidence to establish that the stated reason for her termination—unacceptable performance and behavior—was pretextual.

To be clear, the issue is *not* whether the decision to terminate plaintiff was wise or unwise, or even whether it was fair or unfair: it is whether she suffered retaliation for engaging in protected activity. Because she has not produced sufficient evidence to support that claim, and for the following reasons, summary judgment in favor of defendants will be granted.

## I.      Background

### A.      Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

#### 1.      The Parties

Maria Fournier is a resident of Burlington, Massachusetts. (Fournier Dep. at 6). In 2013, she was hired to be the Director of Support Services at the Executive Office of the Trial Court (the "Executive Office"). (Spence Aff. ¶ 2). That office oversees the Massachusetts Trial Court System. (Williams Aff. ¶ 1). The Chief Justice of the Trial Court oversees the Executive Office's judicial operations, and the Court Administrator oversees its administrative operations. (*Id.* ¶ 2). The latter position was created in 2012. (*Id.* ¶ 3).

Lewis Spence served as the first Court Administrator and worked in that role from 2012 until April 14, 2017. (Spence Aff. ¶¶ 1, 30). John Bello was Acting Associate Court Administrator between April 14 and May 1, 2017. (Bello Aff. ¶ 12; Williams Aff. ¶ 5). Jonathan Williams became the Court Administrator on May 1, 2017. (Williams Aff. ¶ 5).

#### 2.      Fournier's Employment as Director of Support Services

In 2013, Spence hired Fournier to be the Director of Support Services for the Executive

Office.  (Spence Aff. ¶ 2).  In that role, Fournier oversaw services that support the Trial Court's

functions, including law libraries, court transcription, and the Office of Court Interpreter

Services ("OCIS").  (*Id.* ¶¶ 3-4).

OCIS manages the provision of interpreters for the Trial Court by more than 150

independent vendors.  (Def. Ex. 3, at 1).  It provides services for more than 90,000 court events

(principally hearings and trials) each year.  (*Id.*).  Interpretation services are provided in several

languages (principally Spanish, but also Portuguese, Haitian Creole, Russian, Arabic, and many

others) at dozens of court facilities.  (Def. Ex. 6, at 15).  OCIS fulfills requests for interpreters,

manages interpreters' schedules, develops the pool of interpreters, ensures the quality of

interpretation services, and pays interpreters.  (*Id.* at 8).

### 3.      The Consultant's OCIS Review

According to Spence, "[b]oth before and during Fournier's tenure, OCIS was the frequent

subject of criticism by judges, clerks, and members of the public, who complained that services

were not provided in a timely or efficient manner."  (Spence Aff. ¶ 5).  It is undisputed that

Fournier faced significant challenges attempting to improve the performance of OCIS.

Fournier's first performance review was conducted in 2015.  (Pl. Ex. B).  Spence gave

her a generally positive review.  (*Id.*).  Among other things, he wrote that she "has attacked the

manifold challenges of support services with intelligence and courage," that "she has the

fortitude to take hard actions with staff when that is necessary," and that "Support Services is

greatly improved as a result of her leadership."  (*Id*. at 5, 6, 10).  He did, however, criticize her

ability to "manage for the long term," and noted that "she can unwittingly be a bit abrupt with

people" and that she "needs to hone her communication skills."  (*Id*. at 5-6).

In Fournier's 2016 performance review, Spence again made positive comments.  (Pl. Ex.

C).  He stated that she "carries out all the responsibilities of her position," that she "is extremely conscientious, and manages her broad portfolio with comprehensive attention to all areas," and that she "has had a challenging year, but is rising to meet the challenge." (*Id.* at 3, 5).  He again, however, criticized certain aspects of her performance.  For example, he wrote that she "is precise, courageous, innovative and focused on efficiency, but is sometimes rigid in her response to criticism." (*Id.* at 5).  He also wrote that "she works extremely well with other staff when she feels respected," but "[w]hen she feels that she is not respected, she has difficulty with colleagues"; that "her challenge is to communicate with others in an organized and coherent way"; and that she "always wants to be responsive, but can be defensive when faced with questions or criticism." (*Id.* at 6).

According to Spence, by 2016, "[he] had become concerned that progress toward the organizational improvement of OCIS had begun to stall." (Spence Aff. ¶ 9).[1]  On January 11, 2017, the Trial Court requested quotes to conduct an "in-depth review" of OCIS as an area for "possible restructure with the goal of delivering services in a more timely and efficient manner." (*Id.* ¶ 12 & Ex. C).

On January 30, 2017, a contract was awarded to the Ripples Group.  (*Id.* ¶ 13; Habip Aff. ¶ 5; *see also* Def. Ex. 5).  In early 2017, the Ripples Group conducted more than 40 interviews with judges, clerks, and current and former Executive Office employees.  (Habip Aff. ¶¶ 8, 10 &

---

[1] Fournier disputes that fact.  However, her dispute does not come in the form of affirmative evidence to the contrary.  (*See* Pl. Resp. to SMF ¶¶ 8-9 & n.1).  Instead, she contends that the Court should leave credibility determinations arising out of self-serving affidavits to the jury.  (*See id.*).  However, the general rule is that "[a] party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."  *Cadle Co. v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) (citing *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 706 (1st Cir. 1993)); *see also Theidon v. Harvard Univ.*, 948 F.3d 477, 481 n.1 (1st Cir. 2020) ("At the summary judgment phase below, Theidon objected to several of Harvard's proffered statements of material fact as 'subjective' and 'self-serving.'  Because Theidon did not otherwise challenge the accuracy or admissibility of the statements at issue, we (like the district court) consider these facts undisputed unless otherwise noted herein.").

Ex. A, B).  Attila Habip, one of the organization's founding partners, largely handled the review. (*Id.* ¶¶ 1, 8).

During those interviews, the feedback concerning Fournier was overwhelmingly negative.  In particular, respondents were "highly critical of her competency" and "consistently [questioned] her personal values, especially her integrity."  (*Id.* ¶ 9).[2]  According to Habip, he had "never heard this kind of shockingly critical feedback on an executive" in his 30-year career. (*Id.*).

According to Habip, at some point in the process, he "indicated the direction of these interviews to Ms. Fournier."  (*Id.* ¶ 10).  She provided the "names of further people to talk with," which Habip did.  (*Id.*).  Fournier does not dispute that she and Habip had such a conversation. (Pl. Resp. to SMF ¶ 32).

### 4.     The Presentation of the Consultant's Findings

On Friday, March 17, 2017, the Ripples Group presented its findings to senior management at the Trial Court.  (Habip Aff. ¶ 13; *see also* Def. Ex. 6).  That presentation included 51 slides that summarized the consultant's review and findings to date.  (Def. Ex. 6).[3] It identified significant problems at OCIS, including "a wide perception of incompetence," "process and policy shortcomings [that] are glaringly obvious and have remained that way for years," and "unexpectedly strong frustration, hostility, and mistrust."  (*Id.* at 4).

---

[2] Habip also received an e-mail from a former Support Services employee named Vanessa Dillen on March 16, 2017.  (Def. Ex. 7).  Dillen, who Fournier had been passed over for a promotion, likewise made negative comments about Fournier's performance.  (*Id.*).

[3] Fournier has called into question all materials produced by the Ripples Group because of an apparent difference between the slides produced as evidence in this litigation and those shown to her before the litigation started.  (*See, e.g.*, Pl. Resp. to SMF ¶ 14).  However, the only apparent difference is the pagination of the two presentations.  (*Compare* Pl. Ex. F, *with* Pl. Ex. G).  Furthermore, in his affidavit, Habip identified the version of the presentation Ripples gave Trial Court senior management.  (*See* Habip Aff. ¶ 14).  In any event, the pagination difference does not create a genuine dispute as to a material fact regarding the Ripples investigation or the content of the presentation to senior management.

After outlining the problems at some length, the presentation included a slide that stated, "Why do these issues linger and remain unresolved?" (*Id*. at 27). The two subsequent slides focused almost entirely on Fournier's shortcomings. (*Id*. at 28-29).

The first slide was captioned "Poor leadership & management." (*Id*. at 28). It included quotes that criticized Fournier for her "inability to delegate & empower," her "micro-management," her "poor communication with staff & field," her "highly reactive & defensive behaviors," her "loss of trust" that led to "loss of valuable staff," and the absence of "meaningful metrics" in the office. (*Id*.). Among other things, interviewees were quoted as saying, "If she doesn't know what someone is doing, she doesn't want them to do it."; "[There is a] [c]omplete lack of communication that leads to confusion across her staff."; "Decisions are made reactively, if decisions are made at all."; "She turned in[to] a monster[]" and "resorts to bullying tactics and manipulation."; "Maria does not have the temperament to lead a team."; "She can lie without blinking an eye."; "It was against my ethical principles to work for Maria."; and "There is no rhyme or reason to anything she does." (*Id*.).[4]

The second slide was captioned "Unusual and widespread hostility." (*Id*. at 29). It listed nine quotes: "She is a bull in a China shop, operating with a hands-on bully-like mentality. She is overwhelmed."; "She fundamentally doesn't manage anyone. She does not decide anything. She does not write anything down."; "Maria is rather horrible. She lies. She is a poor manager and is inconsistent. She has a lack of foresight."; "Everything I accomplished was despite Maria."; "She has emotional outbursts, and it is hard for her to make decisions."; "She was bullish and hostile toward her staff. She turned into a monster!"; "I am a lawyer and she has

---

[4] Fournier disputes that the interviewees actually said the things contained in the slides. However, whether they were (or were not) said is not the critical issue here; it is whether the consultants presented the quotes—accurate or not—to the decisionmakers.

made me feel like a glorified secretary."; "Maria does not have an understanding or respect for interpreters.  When we are trying to resolve a problem, she takes a defensive stand and justifies her position."; and "OCIS was better before Maria took over."  (*Id*.).[5]

The two critical slides were followed by a third slide titled "Mitigating Factors."  (*Id*. at 30).  That slide stated that Fournier "inherited a broken operation with serious HR issues and no fiscal controls"; that "OCIS faces challenges in creating a positive reputation," and that "Support Services as a whole is a highly demanding and nuanced managerial challenge; Maria had very little support until recently."  (*Id*.).

The presentation included a slide stating that OCIS "[c]annot continue as is" (*id*. at 6) and another slide stating that management "[n]eed[s] to re-launch Maria and Support Services."  (*Id*. at 45 (emphasis omitted)).  According to Habip, at the meeting, he recommended that the Trial Court either needed to "relaunch" Fournier to improve her performance and how she was perceived or remove her as Director of Support Services.  (Habip Aff. ¶ 15).

**5.    Management Reaction to the Presentation**

According to Spence, he "was alarmed at the extent and depth of the problems uncovered by The Ripples Group."  (Spence Aff. ¶ 17).  According to Bello, "although [he] was aware of some of the deficiencies in Ms. Fournier's job performance, [he] had not realized the seriousness and pervasiveness of the problems that were created by her performance."  (Bello Aff. ¶ 7).

The day following the presentation, Saturday, March 18, 2017, Spence left for a vacation.  (Spence Aff. ¶ 18).  As a result, he was out of the office during the week of March 20 to 24.  (*Id.*)  Habip was also out of town the same week.  (Def. Ex. 13).

---

[5] Another slide, in the summary section of the presentation, contained three additional quotes critical of Fournier.  (*Id*. at 5).

On Monday, March 27, Habip met with Fournier.  (Pl. Ex. E).  According to Habip, he did not show her the slides from the presentation, "but communicated the feedback pretty bluntly," and told her "that 'a re-launch of OCIS and [her]' was necessary."  (*Id.*).  According to Fournier, Habip told her, in substance,

> [T]here's no surprise there's unhappy people.  I think we need to rebrand to you the field [sic]. . . .  He said we need to step back and take a look at how we're going to rebrand you.

(Fournier Dep. at 119-20).[6]  According to her, there was no discussion of a possible termination.

After returning from vacation, Spence scheduled a meeting with Fournier for March 31, 2017.  (Spence Aff. ¶ 18).[7]

### 6.   The Reporting of the Discriminatory Remark

According to Fournier, on March 30, 2017, during a Support Services Senior Managers meeting, she was made aware of a discriminatory remark overheard at the Lawrence District Court.  (Fournier Dep. at 152).  After a presentation by John Laing, the Trial Court's Chief Experience and Diversity Officer, a staff interpreter allegedly made a comment that "'blacks' shouldn't be hired and not to management positions."  (Def. Ex. 15; *see also* Fournier Dep. at 152).  Laing is black.  (Fournier Dep. at 154-55).  An OCIS manager told Fournier and the other attendees of the meeting about the comment.  (*Id.* at 152).

---

[6] Before that meeting, Habip sent an email to Chief Justice Paula Carey asking whether there had been "any communications with [Fournier] on what we had discussed" or "any sensitivity [he] should be aware of in advance" of the meeting.  (Def. Ex. 13).  Chief Justice Carey responded that she had "not met with [Fournier] or spoken to her" and there was "no sensitivity that [she was] aware of," but that "[her] sense is that [Fournier] does not fully appreciate the severity of the situation."  (*Id.*).

[7] It is undisputed that a meeting between Spence and Fournier occurred on March 31.  But it is not clear when that meeting was scheduled.  Fournier contends that she was "summoned" or "called to" a meeting on March 31.  (*See* Pl. Mem. at 5; Fournier Dep. at 156).  That characterization implies that the meeting was not scheduled until the day of the meeting, March 31—the day after she reported the discriminatory remark.  Defendants have not produced evidence as to when it was scheduled.  (*See, e.g.*, Spence Aff. ¶ 18 ("A meeting with Ms. Fournier was scheduled for the morning of March 31, 2017.")).  For present purposes, the Court will therefore assume that the meeting had not been scheduled in advance.

That same day, March 30, Fournier reported the comment to Mark Conlon, the Director of Human Resources.  (Fournier Dep. at 151-59).

The next day, March 31, Senior Manager Sybil Martin reported the same comment in an e-mail to Conlon.  (Def. Ex. 16).  Conlon forwarded Martin's e-mail to Heena Trivedi, the Administrative Attorney for Diversity.  (Conlon Dep. at 59-61; Def. Ex. 16).  Trivedi investigated and eventually issued a report on the comment.  (Def. Ex. 19).  Martin was not demoted or terminated after reporting the comment.  (Berrios Dep. at 37-38; *id.* at 22-23).  She is now one of two acting Co-Directors of Support Services.  (*Id.*).

### 7.     Events Between March 31 and April 14, 2017

On Friday, March 31, 2017—the day after Fournier reported the discriminatory remark to Conlon—Spence met with Fournier to discuss her performance and the Ripples Group report. (Spence Aff. ¶¶ 18-19).

According to Spence, at that meeting, he informed Fournier that he "did not have confidence in her ability to continue as the Director of Support Services."  (Spence Aff. ¶ 19). He advised her of "the range of options available to [him], which included demotion and/or separation."  (*Id.* ¶ 20).  And he "suggested that [she] take some time to consider whether she could continue with the Court in an alternative capacity or whether it would be in both parties' best interest for her to terminate her employment with the Court."  (*Id.* ¶ 21).

According to Fournier, at that meeting, Spence said, "I'm taking you out of [Support Services]."  (Fournier Dep. at 169).  She asked the reason, but "[Spence] didn't answer [her] question."  (*Id.*).  According to her, he gave her three options: "[t]ermination, a demotion, or a transfer."  (*Id.*).  When she asked whether she could consult an attorney, he reportedly replied, "If you hire an attorney, your options are off the table."  (*Id.*).  She testified that "[a]t that

meeting," "[she came] to believe that the options Harry Spence [gave her that day] were as a result of [her] report of discrimination." (*Id.* at 177).

After the meeting, Fournier sent an e-mail to Spence indicating that she would "be considering the options [he gave her] over the next few days and will get back to [him] next week." (Def. Ex. 23).

The parties dispute whether Spence was aware before the March 31 meeting that Fournier had orally reported the discriminatory comment to Conlon the previous day. Fournier testified that on March 30, Conlon told her that he had told Spence about her report. (Fournier Dep. at 160-62). Specifically, she testified that on March 30, on the plaza in front of the Suffolk Superior Courthouse, "Mark Conlon told me that he told both [Spence] and John [Laing]" about her report. (*Id.* at 160).[8] Spence, however, testified that he was not aware of the report prior to the meeting (or at any point prior to his retirement). (Spence Dep. at 54-56; Spence Aff. ¶ 31).[9]

At some point during the week of April 3, 2017, Spence "asked [Fournier] whether she had given the issues raised in [the] March 31, 2017 meeting any thought," but she "was unable to offer any substantive resolution to [his] concerns regarding her remaining in [her] position." (Spence Aff. ¶ 23).[10]

---

[8] Defendants do not contend that this statement is inadmissible hearsay.

[9] Spence had also met with Laing on March 31, immediately before his meeting with Fournier. Fournier suggests that Spence and Laing could have spoken about her report of the discriminatory remark at that time, although both deny doing so. (Spence Dep. at 54-56; Laing Aff. ¶ 7). Both also deny that they were even aware of the remark at that time. (*Id.*). In any event, the Court will assume that Spence was aware of the report as of the March 31 meeting with Fournier.

[10] On Saturday, April 1, 2017, Habip e-mailed Spence and Chief Justice Carey about a telephone call he had with an OCIS scheduler the day before. (Def. Ex. 24; Habip Aff. ¶ 18). Habip wrote that "[w]hat came out [on the call was] an environment of disrespect, abuse, and (again) lies." (Def. Ex. 24). He also wrote that "virtually everyone in the group" of schedulers was trying to leave or move to another position in the Trial Court. (*Id.* (emphasis omitted)). Habip concluded that "if you have the tiniest bit of remorse about this decision, please don't. Things must change. This is beyond repair for sure and even **more urgent** than we had portrayed before." (*Id.* (emphasis in original)). Fournier disputes that the call took place, but again has submitted no affirmative testimony

On April 5, Fournier sent an e-mail to Spence saying that she wanted "to apologize that [he has] had to defend [her] to Chief Justice Carey for the past 18 months." (Def. Ex. 22). She thanked Spence for supporting her and said that "[his] statement that [her] reputation in the organization is irreparable is one [she has] taken very seriously and would like to attempt to repair regardless of what happens." (*Id.*).

On April 10, Spence informed Fournier by letter that he would convene an informal hearing on April 11 "to examine [her] performance problems as Director of Support Services and afford [her] an opportunity to formally respond orally or in writing." (Spence Aff. Ex. E). The letter said that Spence had received information that she had been "inappropriately adversarial with a wide variety of colleagues and subordinates" and had "demonstrated a lack of professionalism in those encounters, with the result that many of [her] colleagues and subordinates have been met with [her] unreasonable anger, arbitrary decision-making, inability to listen and impenetrable obstinacy." (*Id.*). It also said that "[i]t appears that [she lacks] the managerial skills that are crucial to success" in her position and that "[t]he result of these often unprofessional behaviors, if substantiated, is that [her] ability and capacity to lead the department with credibility and the respect of [her] peers and subordinates have been irreparably harmed." (*Id.*). It concluded by stating that "with regret" he was "contemplating removing [her] from [her] position as Director of Support Services." (*Id.*).

Fournier's counsel requested a continuance of the informal hearing, which was granted. (Spence Aff. ¶¶ 25-26). The parties held a meeting on April 12, which did not resolve the matter. (*Id.* ¶¶ 26-29).

---

to support that contention. (*See* Pl. Resp. to SMF ¶¶ 56-57). She also disputes that the statement concerned removing her from her position. (*Id.* ¶ 60).

On Friday, April 14, Spence placed Fournier on paid administrative leave.  (*Id.* ¶ 30 & Ex. F).  He wrote a letter to Fournier stating that he was taking that action "as a result of reports received by [his] office that [her] behavior and job performance have been unsatisfactory and are hindering the operational needs of the Court."  (*Id.* Ex. F).

That same day, April 14, Spence retired as Court Administrator.  (*Id.* ¶¶ 30-31).

### 8.  Events after April 14, 2017

The incoming Court Administrator, Jonathan Williams, had been hired from a similar position in North Carolina but had not yet moved to Massachusetts.  (Williams Aff. ¶ 5).  In the interim, from April 14 to May 1, 2017, John Bello served as Acting Associate Court Administrator.  (Williams Aff. ¶ 6; Bello Aff. ¶¶ 11-12).  According to Bello, after starting as acting administrator, he "began to hear the same criticisms and complaints about Ms. Fournier's performance that had been identified by The Ripples Group."  (Bello Aff. ¶ 18).[11]

On April 25, 2017, Fournier sent a letter to Conlon stating that Spence's motive to remove her was retaliation for complaining of discrimination.  (Fournier Dep. at 153-54).[12]  Two days later, Trivedi, the Administrative Attorney for Diversity, began an investigation into whether Spence had retaliated against Fournier.  (Williams Aff. ¶ 11; Pl. Ex. S).

On April 28, Bello held an informal disciplinary hearing with Fournier and her counsel.  (SMF ¶ 68).  Prior to the hearing, Fournier's counsel had submitted a letter responding to the charges.  (Fournier Dep. at 228).  At the hearing, "the charge letter was reviewed," and "[t]he potential outcomes of the hearing, including termination, [were] discussed."  (Bello Dep. at 207).  Two PowerPoint slides from the Ripples presentation were presented.  (*Id.* at 46).  According to

---

[11] Fournier disputes that fact, again on the ground that it is based on a self-serving affidavit (Pl. Resp. to SMF ¶ 69), but she does not offer any evidence to the contrary.

[12] The letter itself is not part of the record.

Bello, he did not obtain "the identity of the individuals that were quoted" in the Ripples presentation or any notes from the Ripples investigation. (*Id.* at 214-15).

Two weeks after the hearing, Fournier's counsel "supplement[ed] the oral presentation . . . made at the informal hearing" by sending a letter to Bello. (Pl. Ex. R at 1). Fournier's counsel contended that Spence and the Executive Office "decided to terminate her before the hearing took place"; that "Ms. Fournier's colleagues were informed to not [contact] her"; that "Ms. Fournier's name plate was removed from outside her office, and the locks on her office door were changed"; and that "Ms. Fournier was placed on administrative [leave] without any evidence of 'exceptional circumstances' as required by the [Executive Office's] Regulations, §16.600(c)." (*Id.* at 2). The letter also noted that the evidence at the informal hearing consisted of Spence's letter placing Fournier on administrative leave and the two PowerPoint slides from the Ripples presentation. (*Id.* at 3).

On May 1, Williams assumed his position as Court Administrator. (Williams Aff. ¶ 5).

On June 16, Trivedi issued her report, which concluded that no retaliation occurred. (Pl. Ex. S). That same day, Bello sent a letter to Williams, copying Conlon and Fournier's counsel, that outlined the findings of the Ripples Group and additional evidence concerning Fournier's performance and behavior. (Def. Ex. 29). The letter recommended that Fournier be removed from her position. (*Id.* at 6).[13]

On August 11, 2017, the Human Resources Department concluded its review of Bello's June 16 recommendation that Fournier be terminated. (Williams Aff. Ex. C). That review included input from Fournier and her counsel. (*Id.* at 1-2). The letter from Human Resources

---

[13] Elizabeth Day, an attorney for the Trial Court, drafted that letter for Bello's review. (Bello Aff. ¶ 23; Bello Dep. at 44, 183).

described the review's process and results and concluded that there was "a reasonable basis to terminate [Fournier] from her position." (*Id.* at 3).

On August 15, 2017, Williams terminated Fournier's employment. (Williams Aff. ¶ 17; Def. Ex. 30). Williams explained that his decision was based on the Trial Court's record concerning the charges brought against Fournier, the recommendation from Bello and Day, the recommendation from Human Resources, and Fournier's counsel's submissions during the termination process. (Def. Ex. 30).[14]

### B.   Procedural Background

The original complaint in this action was filed on May 2, 2018. That complaint alleged violations of Title VII, 42 U.S.C. § 2000e-2; the Massachusetts Whistleblower Act, Mass. Gen. Laws ch. 149, § 185; the Massachusetts Anti-Discrimination Act, Mass. Gen. Laws ch. 151B; and Massachusetts common law.

On July 30, 2018, defendants moved to dismiss most of the claims based on Eleventh Amendment immunity, abstention under 28 U.S.C. § 1367(c), and the exclusivity of the Massachusetts Whistleblower Act.

After the motion was filed, the parties agreed to dismiss certain claims with prejudice but to allow Fournier to litigate her Title VII and Massachusetts Whistleblower Act claims. The Executive Office submitted to the Court's jurisdiction for the narrow purposes of litigating Fournier's claim under the Massachusetts Whistleblower Act.

On October 5, 2018, in accordance with the parties' agreement, Fournier filed an amended complaint. The amended complaint alleges claims for retaliatory termination in

---

[14] Plaintiff again disputes these facts on the ground that they are based on statements in self-serving affidavits. (Pl. Resp. to SMF ¶ 72).

violation of Title VII, 42 U.S.C. § 2000e-3, against all defendants in their official capacities

(Count 1) and for retaliatory termination in violation of the Massachusetts Whistleblower Act,

Mass. Gen. Laws ch. 149, § 185, against the Executive Office (Count 2).  Defendants have

moved for summary judgment on both counts.[15]

## II.   <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order

to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co.*, 950 F.2d 816,

822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence,

viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve

the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8

(1st Cir. 1990) (internal citation omitted).  When evaluating a summary-judgment motion, the

court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor*, 994

F.2d at 907.  If "a properly supported motion for summary judgment is made, the adverse party

must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and footnotes omitted).  The

nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but

instead must "present affirmative evidence."  *Id.* at 256-57.

---

[15] Plaintiff has asserted a Title VII claim against Spence, Bello, and Williams in their official capacities. (Amended Compl. ¶ 38).  It is well-settled that "a Title VII claim brought against a supervisory employee in his official capacity as an agent of the employer operates as a claim against the employer."  *Brandt v. Fitzpatrick*, 957 F.3d 67, 74 n.5 (1st Cir. 2020) (quoting *Ríos-Colón v. Toledo-Dávila*, 641 F.3d 1, 4 (1st Cir. 2011)).  As a result, the claims against Spence, Bello, and Williams in their official capacities are duplicative of the claim against the Executive Office, and will be treated in the same manner.

### III.   Analysis

Defendants contend that plaintiff has failed to offer evidence showing a causal nexus between her protected conduct and her termination.  (Def. Mem. at 1-2).  Defendants also contend that, even if plaintiff establishes a causal nexus, she has not demonstrated that defendants' justification for plaintiff's termination was pretextual.  (*Id.* at 2).  For the reasons below, the Court will grant the motion to dismiss.

### A.   Framework for Plaintiff's Claims

The amended complaint asserts two claims for unlawful retaliation, one under Title VII and one under the Massachusetts Whistleblower Act.  Both claims will be analyzed under the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015) (applying framework to Title VII retaliation claim); *Pierce v. Cotuit Fire Dist.*, 741 F.3d 295, 303 (1st Cir. 2014) (applying framework to Massachusetts Whistleblower Act claim).[16]

The *McDonnell Douglas* framework "allocates the burdens of production and persuasion in accordance with a three-step procedure."  *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir. 1998) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04).  First, the plaintiff must present evidence sufficient to establish a *prima facie* case of retaliation.  *See id*.  Second, if the plaintiff produces such evidence, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions."  *Planadeball*, 793 F.3d at 175 (citing *Collazo v.*

---

[16] Plaintiff urges the Court to apply a "mixed-motive" analysis rather than the *McDonnell Douglas* burden-shifting framework.  (Pl. Mem. at 8-9).  But the Supreme Court rejected "mixed-motive" analysis in Title VII retaliation claims in *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013).  Title VII retaliation claims are properly analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Brandt*, 957 F.3d at 81 ("[A] retaliation claim follows the *McDonnell Douglas* dance.  Unlike with a status-based discrimination claim, a plaintiff alleging retaliation can't rely on a mixed-motives theory[.]" (internal citation omitted)).  Massachusetts Whistleblower Act claims are subject to a similar analysis.  *See Pierce*, 741 F.3d at 303.

*Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010)).  Third, if the defendant offers

such an explanation, "the burden shifts back to the plaintiff to show that the defendant's

explanation is a pretext for unlawful retaliation."  *Id.* (citing *Collazo*, 617 F.3d at 46).

### B.      **Application**

The present dispute centers on the first step of the framework—establishing the *prima*

*facie* case—and its third step—demonstrating the defendant's explanation for its actions is

pretextual.

### 1.      ***Prima Facie* Case**

The first step, the *prima facie* case, is similar for claims under Title VII and under the

Massachusetts Whistleblower Act.  To establish a *prima facie* case of retaliation under either

statute, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an

adverse employment action, and (3) the adverse employment action was causally connected to

the protected activity.  *See Gerald v. University of Puerto Rico*, 707 F.3d 7, 24 (1st Cir. 2013)

(describing *prima facie* case under Title VII); *Pierce*, 741 F.3d at 303 (describing *prima facie*

case under the Massachusetts Whistleblower Act).

As a threshold matter, there is at least some issue as to the precise nature of the protected

activity in which plaintiff engaged.  Her brief claims that her protected activity was reporting

"widespread racism at the trial courts," as opposed to reporting the single discriminatory remark

she heard about at the Support Services Senior Managers meeting.  (Pl. Mem. at 8; *see also id.* at

10 ("It is undisputed that Fournier's oppositional activity was opposing widespread racism and

race discrimination which she believed to be discriminatory (and thus unlawful) at the Trial

Courts.")).[17]  She testified in her deposition, however, that she only reported the specific remark.[18]  Conlon—to whom she made the report—testified to the same effect.[19]  Furthermore, plaintiff has not disputed defendants' characterization of her action for purposes of summary judgment as "report[ing] a comment" to Conlon.[20]  Under the circumstances, it is difficult to see the basis of her current claim that she reported "widespread racism," as opposed to the specific remark.[21]

In any event, the parties do not dispute that plaintiff engaged in protected activity and suffered an adverse employment action.  They dispute, however, whether plaintiff has shown a causal nexus between her protected activity and her adverse employment action.

---

[17] Plaintiff characterized her report similarly in her answers to interrogatories.  (Def. Ex. 21, at 6 ("On March 30, 2017, Fournier reported a complaint of widespread race discrimination at the Trial Court to Mark Conlon, the Director of Human Resources; and Spence was notified of same.")).

[18] For example, plaintiff stated that she "only reported the one incident involving John [Laing] and [the interpreter's] statement."  (Fournier Dep. at 185).  In addition, she testified that the April 25, 2017 letter she wrote to Conlon "discussed the complaint of discrimination" that she made.  (Id. at 151).  As described by her, that letter "contained what was related to [her] during the senior managers' meeting in the morning on March 30th."  (Id.; see also id. at 159 ("I had written the letter just basically saying what transpired in the senior managers' meeting.")).  That letter read in part:  "As you know on March 30, 2017, I raised with you an internal [complaint] of unlawful discrimination.  Specifically I reported comments that blacks should [not] be hired into management positions."  (Id. at 154).  She also agreed that it was "[f]air to say" that "[t]he report is about this specific comment."  (Id. at 157).  She did, however, also testify in general terms that she had reported "widespread racism" and "a pattern of racial discrimination."  (Id. at 182-85).

[19] Conlon testified that plaintiff's report only addressed the specific comment.  (Conlon Dep. at 21-22).  He also testified that he "believe[d]" that Martin's e-mail (which addressed only the single comment) discussed "the same issue that [plaintiff] reported" to him.  (Id. at 61).

[20] Defendants' Statement of Material Facts indicates that plaintiff "reported the comment [discussed in the Support Services Senior Managers' meeting] to the Director of Human Resources, Mark Conlon."  (SMF ¶ 42).  The Statement of Material Facts also indicates that "Sybil Martin reported the same comment in an email to" Conlon.  (Id. ¶ 43; Def. Ex. 15).  Plaintiff did not dispute or supplement either fact.  (Pl. Resp. to SMF ¶¶ 42-43).

[21] It is also noteworthy that the report prepared by Trivedi characterizes plaintiff's action as reporting the specific remark.  As noted, Trivedi investigated the allegations of retaliation and produced a report to management; that report states that plaintiff informed Trivedi that on March 30, 2017, "[she] met with [Conlon] to inform him of allegations made by an interpreter in a staff meeting."  (Pl. Ex. S at 2).  The report does not mention that plaintiff informed Trivedi that she reported "widespread" racism to Conlon.  (Id.).

The causation standard may differ between Title VII retaliation claims and Massachusetts Whistleblower Act claims. For Title VII retaliation claims, a plaintiff must show that the protected conduct was a "but-for" cause of the adverse employment action. *See Nassar*, 570 U.S. at 359-60 (holding that Title VII retaliation claims require "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer"). The fact that the protected conduct was a "motivating" factor in the adverse employment action, without more, is not sufficient. *See id.*

For Massachusetts Whistleblower Act claims, the causation standard is unclear. The First Circuit and courts in this district have repeatedly applied a "substantial or motivating part" standard. *See, e.g.*, *Pierce*, 741 F.3d at 303; *Welch v. Ciampa*, 542 F.3d 927, 943 (1st Cir. 2008); *Larch v. Mansfield Mun. Elec. Dep't*, 272 F.3d 63, 70 (1st Cir. 2001); *Cass v. Town of Wayland*, 383 F. Supp. 3d 66, 82 (D. Mass. 2019); *Fox v. Town of Framingham*, 2016 WL 4771057, at *3 (D. Mass. Sep. 13, 2016). The Massachusetts Supreme Judicial Court has yet to rule on the causation standard, and to the extent the Massachusetts Appeals Court has done so, the decisions provide conflicting guidance. *Compare Trychon v. Massachusetts Bay Transp. Auth.*, 90 Mass. App. Ct. 250, 255-60 (2016) (applying the "substantial or motivating part" standard) (citing *Welch*, 542 F.3d at 943; *Taylor v. Freetown*, 479 F. Supp. 2d 227, 241 (D. Mass. 2008)), *with Orfaly v. Office of Cmty. Corrections*, 2013 WL 1149317, at *2 (Mass. App. Ct. Mar. 21, 2013) (upholding "determinative cause" definition in jury instructions).

As defendants point out, the Supreme Judicial Court has interpreted certain statutory provisions with language comparable to that in the Massachusetts Whistleblower Act to require that a plaintiff satisfy a "determinative cause" or "but-for cause" standard. (Def. Supp. Br. at 3-4). But the court's more detailed articulation of that standard makes unclear whether there is any

material difference between the "determinative cause" standard and the "substantial or motivating part" standard. *See Lipchitz v. Raytheon Co.*, 434 Mass. 493, 506 n.19 (2001) (explaining that under the "determinative cause" standard, a plaintiff must show that "the defendant's discriminatory animus contributed significantly to that action, that it was a material and important ingredient in causing it to happen").

Rather than resolve that issue, the Court will simply assume, without deciding, that plaintiff has established a *prima facie* case of retaliation for both her Title VII claim and her Massachusetts Whistleblower Act claim. *See Luceus v. Rhode Island*, 923 F.3d 255, 258-59 (1st Cir. 2019) ("bypass[ing] the prima facie case issue" and "[a]ssuming without deciding that [plaintiff] has established a prima facie case of disparate treatment" (internal quotation marks and citations omitted)).

### 2.   **Legitimate, Non-Retaliatory Explanation**

Assuming plaintiff has established a *prima facie* case of retaliation under both statutes, the burden shifts to defendants to articulate a legitimate, non-retaliatory explanation for their actions. *See Planadeball*, 793 F.3d at 175 (citing *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 46 (1st Cir. 2010)); *Pierce*, 741 F.3d at 303. Examples of legitimate, non-retaliatory explanations that satisfy a defendant's burden include poor workplace performance, *see, e.g.*, *Planadeball*, 793 F.3d at 179; *Ponte v. Steelcase Inc.*, 741 F.3d 310, 323 (1st Cir. 2014); creating a hostile work environment, *see, e.g.*, *Pierce*, 741 F.3d at 304; potential ethics violations, *see, e.g.*, *id.*; unlawful conduct, *see, e.g.*, *McDonnell Douglas Corp.*, 411 U.S. at 802-03; missing work regularly, *see, e.g.*, *Sánchez-Rodríguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 15 (1st Cir. 2012); and job abandonment, *see, e.g.*, *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 33 (1st Cir. 2019); *Mariani-Colón v. Department of Homeland Sec.*, 511 F.3d 216, 224

(1st Cir. 2007).

Here, defendants have offered a legitimate, non-retaliatory reason for plaintiff's termination:  plaintiff's unacceptable behavior and performance as Director of Support Services. *See Ponte*, 741 F.3d at 323 (concluding that poor job performance constitutes a legitimate, non-retaliatory reason for termination).

### 3. <u>Evidence of Pretext</u>

Because defendants have offered a legitimate, non-retaliatory explanation for plaintiff's termination, she must show that the proffered explanation is a pretext for unlawful retaliation. *See Planadeball*, 793 F.3d at 175.

"The pretext inquiry focuses on the employer, and whether the employer believed that its stated reason for the termination was credible." *Ponte*, 741 F.3d at 323 (citing *Meléndez v. Autogermana, Inc.*, 622 F.3d 46, 53 (1st Cir. 2010)).  Without the assistance of the "original inference of discrimination," *Mesnick*, 950 F.2d at 824, "a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive." *Ponte*, 741 F.3d at 323 (quoting *Mesnick*, 950 F.2d at 824); *see also Brandt*, 957 F.3d at 82 (explaining that plaintiff must show that employer's stated justification was "not only a sham, but a sham intended to cover up [a retaliatory] motive" (alteration in original) (quoting *Robinson v. Town of Marshfield*, 950 F.3d 21, 25 (1st Cir. 2020))).

There is "no mechanical formula" to show pretext. *Billings v. Town of Grafton*, 515 F.3d 39, 55 (1st Cir. 2008) (quoting *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 39 (1st Cir. 2003)) (internal quotation marks omitted).  But a plaintiff "must produce sufficient evidence to create a genuine issue of fact as to two points:  1) the employer's articulated reasons for its adverse actions were pretextual, and 2) the real reason for the employer's actions was

23

[retaliatory] animus." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 113 (1st Cir. 2015) (quoting

*Mariani-Colón*, 511 F.3d at 223).  One method for a plaintiff to show pretext is to identify

"weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

unworthy of credence . . . ." *Theidon*, 948 F.3d at 497 (quoting *Adamson v. Walgreens Co.*, 750

F.3d 73, 79 (1st Cir. 2014)).  Other evidence of pretext includes "deviations from standard

procedures, the sequence of occurrences leading up to a challenged decision, and close temporal

proximity between relevant events."  *Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d

25, 33 (1st Cir. 2012) (citing *Hodgens*, 144 F.3d at 168-70).

In substance, plaintiff points to four categories of evidence in support of her claim of

pretext:  (1) the temporal proximity of events; (2) the allegedly "admitted" racism of Spence; (3)

her allegedly disparate treatment compared to similarly situated employees; and (4) the alleged

misconduct and inappropriate actions of the decisionmakers, including lying, not putting things

in writing, providing shifting explanations, and deviating from normal procedures.[22]  Even

considered collectively, however, the evidence in the record does not raise a genuine issue of

material fact either that defendants' stated reason for her termination was pretextual or that the

real reason for defendants' actions was retaliatory animus.  *See Ray*, 799 F.3d at 113-14, 114

---

[22] Plaintiff identifies the same evidence to support causation and pretext.  Because the Court assumes, without deciding, that she has made out a *prima facie* case of discrimination and because similar evidence can support causation and pretext, *see, e.g.*, *Ponte*, 741 F.3d at 323 (concluding that plaintiff failed to show that employer's justification was pretextual "for the reasons we have amply discussed" with respect to causation), the Court will consider all of plaintiff's proffered evidence as support for pretext.

Also, plaintiff identifies the same evidence of pretext for her Title VII retaliation claim and her Massachusetts Whistleblower Act claim.  (Pl. Mem. at 19-20).  Because the pretext inquiries for Title VII retaliation claims and Massachusetts Whistleblower Act claims are similar, if not identical, the Court will consider them jointly.

n.9.[23]  As a general matter, plaintiff's claims are unsupported by the record, immaterial to

establishing pretext, or both, even when the record is viewed in the light most favorable to her.

### a.      Temporal Proximity of Events

Plaintiff's pretext argument depends to a very large degree on the temporal proximity

between her protected conduct and her termination.[24]  When an adverse employment action

closely follows protected conduct, the sequence and proximity of events can establish that an

employer's proffered justification for the adverse employment action was pretextual.  *See*

*Harrington*, 668 F.3d at 33 (citing *Hodgens*, 144 F.3d at 168-70).  However, "proximity in

timing does not alone suffice to create a genuine issue of material fact as to pretext" when other

relevant events explain the timing.  *Micheo-Acevedo v. Stericycle of Puerto Rico, Inc.*, 897 F.3d

360, 366 (1st Cir. 2018); *see also Planadeball*, 793 F.3d at 179 (explaining that temporal

proximity is not sufficient, by itself, to raise an inference of pretext when timing of adverse

employment action "[made] sense" given the context); *Mariani–Colón*, 511 F.3d at 224 (holding

that temporal proximity between plaintiff's complaints of discrimination and his discharge failed

to raise an inference of pretext where the timing made sense because plaintiff was fired a few

weeks after he voluntarily took unpaid leave).  That is true even when the period of temporal

proximity is relatively short.  *See, e.g.*, *Carreras v. Sajo, García & Partners*, 596 F.3d 25, 38

(1st Cir. 2010) (concluding that four-day period between plaintiff's protected conduct and his

---

[23] Even though the Court separately discusses each type of evidence, the "totality of the evidence" when considered as an "aggregate package of proof" is insufficient to raise a genuine issue of material fact.  *Ray*, 799 F.3d at 114 n.9 (quoting *Fernandes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 581 (1st Cir. 1999)).

[24] Courts often consider temporal proximity between protected conduct and an adverse employment action when evaluating whether a plaintiff has shown a causal nexus between those events.  *See, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).  But temporal proximity may also be relevant to the pretext inquiry.  *See Harrington*, 668 F.3d at 33 (explaining that "close temporal proximity between relevant events" can give rise to an inference of pretext).  Here, the Court is assuming that plaintiff has shown causation and will address the issue of temporal proximity as part of its analysis of pretext.  (*See* Pl. Mem. at 13 ("A jury could use this smoking gun [of temporal proximity] to find pretext." (emphasis omitted)).

firing was insufficient, by itself, to show pretext for retaliation claim under Americans with Disabilities Act).

Here, it is undisputed that plaintiff reported the discriminatory comment on March 30 and that the next day, March 31, she met with Spence and received negative feedback concerning the issues for which she was ultimately fired.  Indeed, plaintiff argues that the adverse employment action was taken the "very next day" following her protected conduct.  (Pl. Mem. at 1; *see also id.* at 8 ("[T]he 'proximity in time' between Spence's knowledge of Fournier's protected activity and the decision to terminate her was <u>one day</u>."); *id.* at 20 ("[W]hen Fournier opposed discrimination, Spence retaliated within 24 hours . . . .")).  According to plaintiff, Habip's recommendation was only to "relaunch" her, not terminate her, and "Spence did not want to fire [her] before her oppositional activity."  (*Id.* at 13 (emphasis omitted)).[25]  She argues that "[t]hat all changed on March 31, 2017," the day after she engaged in protected conduct, and that "[a] jury could use this smoking gun to find pretext."  (*Id.* (emphasis omitted)).[26]

There are multiple issues with that argument, beginning with the fact that plaintiff was not in fact terminated on March 31, but on August 15.  In fact, plaintiff herself argues that the adverse employment event was her termination.  (*See id.* at 8-9 ("There is no dispute that Fournier suffered an adverse [employment] action:  she was terminated.")).  And even if the

---

[25] It is far from clear that there is record evidence supporting that contention.  It is true that Habip did say that a "relaunch" of Fournier was one option, and that option was included on the slides presented to management.  (Def. Ex. 6, at 45).  But he also suggested that removing her from her position as director of Support Services was another.  (Habip Aff. ¶ 15).  Plaintiff also contends that "Habip . . . confirmed that prior to March 31, 2017, Spence did not want to terminate Fournier."  (Pl. Mem. at 13 (citing Pl. Ex. H at 2)).  But the e-mail exchange on which she relies indicates only that Spence "wanted to keep her" in another position at the Trial Court, not as Director of Support Services.  (Pl. Ex H. at 2).  It further states that Spence "came up with a new position" for plaintiff, which she did not accept.  (*Id.*).

[26] The probative value of this proximity is largely contingent on plaintiff's contention that Spence knew of her protected conduct at the time of this meeting.  That fact, as stated above, is disputed, and the Court will therefore assume for present purposes that plaintiff's version is correct.

Court assumes that the relevant event is defendants' decision to terminate plaintiff, rather than her formal termination date, it is far from clear that March 31 is the operative date. Plaintiff testified that on that date Spence provided her three options: "[t]ermination, a demotion, or a transfer." (Fournier Dep. at 169). After the meeting, she sent an e-mail to Spence indicating that she would "be considering the options [he gave her] over the next few days" and that she "[would] get back to [him] next week." (Def. Ex. 23). The evidence therefore suggests that defendants had not yet decided to take the adverse employment action—that is, termination—by March 31.

Another significant problem for plaintiff is that she was terminated by a different person, Williams, who was not even employed by the Trial Court when she engaged in the protected conduct. There is no evidence that Williams harbored retaliatory animus of any kind; instead, plaintiff argues that the unlawful animus of Spence, Bello, and/or Trivedi infected the termination decision of Williams, and was therefore the true motivating force behind that decision. (Pl. Mem. at 18-19).

The fact that Williams was the actual decisionmaker is not necessarily fatal to her claim; a plaintiff can proceed on a so-called "cat's paw" theory of employer liability, where the unlawful animus of an individual who is not the actual decisionmaker is nonetheless the motivating force behind the adverse employment action. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 416 (2011); *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 42 (1st Cir. 2011); *Cariglia v. Hertz Equip. Rental Corp.*, 363 F.3d 77, 85-88 (1st Cir. 2004) (discussing imputing subordinate's discriminatory animus to decisionmaker). But that fact is not helpful to plaintiff's cause either, as it represents another aspect of the larger picture that undercuts the inference of retaliation. *See Ponte*, 741 F.3d at 322.

27

In any event, any reasonable inference that can be drawn from the proximity of events is substantially undercut by the other evidence in the record. The First Circuit's decision in *Ponte v. Steelcase Inc.*, 741 F.3d 310 (1st Cir. 2014), is instructive. There, the court rejected an appeal from a decision granting summary judgment to the defendant even though the plaintiff undertook conduct protected by Title VII shortly before she was terminated. *See id.* at 322. The court concluded that the plaintiff had failed to show causality and pretext because the "larger picture" undermined the significance of the "chronological proximity." *See id.* (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003)) (alterations omitted); *id.* at 323 (explaining plaintiff did not show that employer's proffered justification was pretextual "for the reasons we have amply discussed"). The plaintiff had suffered from documented performance problems predating her protected conduct; complaints regarding her performance came from parties unrelated to the protected conduct at issue; multiple parties, including those with no apparent interest in her protected conduct, agreed that termination was the only viable option; and the plaintiff herself admitted that she suffered performance problems. *See id.* at 322-23.

The record in this case is analogous to that in *Ponte*. There is voluminous evidence that plaintiff performed her job poorly—indeed, that her performance was disastrous—and that she engaged in serious workplace misbehavior. (Def. Ex. 6, at 28-29). Before her protected conduct, the Ripples Group presentation was commissioned and presented. (Habip Aff. ¶¶ 3-5, 13). Habip, an individual with no apparent interest in the outcome of plaintiff's career, specifically recommended that she be either "relaunch[ed]" or removed from her current role. (*Id.* ¶ 15). Both Habip and Chief Justice Carey acknowledged her performance issues in writing. (Def. Ex. 13). Those issues were communicated to plaintiff. (Fournier Dep. at 119-20). And after her protected conduct, plaintiff herself apologized to Spence that he had to defend her to

28

Chief Justice Carey "for the past 18 months." (Def. Ex. 22).[27]

Under the circumstances, the temporal proximity between plaintiff's protected conduct and her termination is insufficient, without more, to show that defendants' stated justification for her termination is pretextual. *See Micheo-Acevedo*, 897 F.3d at 366; *Planadeball*, 793 F.3d at 179; *Mariani–Colón*, 511 F.3d at 224. The question then becomes whether plaintiff has produced additional evidence that, when combined with the evidence of temporal proximity, is sufficient to make the necessary showing.

### b.    Spence's Allegedly "Admitted" Racism

Plaintiff attempts to bolster her case by claiming that she has "direct evidence" of Spence's retaliatory motive: "Spence is a racist who supports other racists." (Pl. Mem. at 9).[28] Plaintiff, however, grossly misrepresents and distorts the evidence of that purported "fact."

First, plaintiff contends that "it is undisputed in the record that Spence readily admitted he is a racist." (*Id.*). But Spence's purported "admission," according to the testimony plaintiff cites, was as follows:

Q.    Mr. Spence, do you believe you are a racist?

A.    I believe that for a white person living in America, it's almost impossible not to have absorbed some elements of racism from the culture. So I do my very best to weed out any of those elements . . . [.]    [O]n the implicit bias website I actually was startled to discover that I do not come up having negative attitudes about African-Americans, at the unconscious level . . . .    So as I say—am I racist[?]    I think anyone white in America has some elements . . . of racism in them.    But this is something that I have spent a lot of my

---

[27] Plaintiff argues that defendants "cannot support their allegations of poor performance." (Pl. Mem. at 17). It is unclear what she means by that; an independent consultant was hired, conducted an extensive investigation, and prepared a presentation addressing those very issues. (*See* Def. Ex. 6, at 28-29). This is not a case where a supervisor has made an after-the-fact accusation of performance deficiencies without any contemporaneous evidence. *See Carreras*, 596 F.3d at 37-38. To the extent that she is arguing that the Ripples Group report was based on insufficient evidence or reached improper or unfair conclusions, that is not the issue before the Court; there is no dispute that the findings were presented to management before the protected activity occurred.

[28] For what it is worth, even if that statement were to be credited, that evidence would not be direct; his alleged racism is, at most, circumstantial evidence.

> life working very hard on. . . . [E]very job, I think, I have ever had has engaged issues of race, and I have worked very hard on those issues to diminish institutional racism, to increase diversity and the like, so the answer is, yes, like any white person, some elements of that, but it's a matter that has been very important to me to address.

(Spence Dep. at 104-05; *see also id.* at 118 ("I think all white people have elements of racism in them . . . .")).  That expression of candor and self-awareness is hardly an admission by Spence that he is a racist—and, by inference, that he would therefore retaliate against an employee for reporting a racially discriminatory remark.[29]

Plaintiff also claims that Spence "supported" another employee accused of using a racial slur who received a transfer and a pay raise.  (*Id.* at 9-10).  Again, however, she wholly mischaracterizes the deposition testimony, which is the only evidence on which she relies.  Spence testified:  "That [promotion] was not a decision I was involved in.  That was a decision made by the Probate and Family Court.  I was entirely unaware of the charges against [her] at the time [of the transfer]."  (Spence Dep. at 116; *see also id.* at 117 ("I was unaware of [the allegation] at any point [prior to the transfer], and I wasn't involved in making the decision to move her.  That was a decision by [a supervisory court administrator and a judge].")).  He also testified that he "didn't believe that [he] should go back to those who had made those decisions and tell them they were mistaken decisions," and that he was "unhappy with the judgments and decisions that were made."  (*Id.* at 120; *see also id.* at 121 ("I didn't think it was appropriate . . . to go to the people who made those decisions and [upbraid] them.")).

Plaintiff next claims that Spence "had no choice but to admit that he supported" the supervisory court administrator in question for a judgeship.  (Pl. Mem. at 10).  But the evidence

---

[29] Spence also testified that he and Chief Justice Carey "initiated the most comprehensive work on race of any court system in the United States," engaging outside experts and working with judges and staff to "improve diversity and inclusion throughout the court system" and "examining ways . . . in which the court system might be contributing to disproportionate incarceration of people of color."  (Spence Dep. at 114-15).

she cites indicates no such thing.  To the contrary, Spence testified that she was "the weakest court administrator in the system [out of seven], and I personally did not think she should be a judge."  (Spence Dep. at 165-66).

Finally, plaintiff claims that "Spence directed the Diversity Office to change findings to unsubstantiated on race complaints."  (Pl. Mem. at 10).  Her cited evidence of that "fact" is her own deposition testimony, in which she passes on a comment that, at a minimum, is inadmissible hearsay.[30]

There is no other evidence in the record concerning Spence's purported racism.  In short, the evidence purporting to support the claim that Spence is an "admitted" racist is wholly deficient, even when viewed in the light most favorable to plaintiff, and certainly does not support her claim that she was fired for retaliatory reasons.

### c.      Disparate Treatment Compared to Similarly Situated Employees

Plaintiff next contends that she suffered disparate treatment compared to similarly situated employees.  (Pl. Mem. at 18).  Specifically, she contends that Craig Burlingame, the Director of Information Technology, and Chris Fox, the Deputy Court Administrator, faced allegations of poor workplace performance similar to those made against her, but did not engage in any protected conduct and were not fired.  (*Id.*).

"An employer's disparate treatment of employees in response to behavior that legitimately offends the employer can provide evidence of discriminatory animus."  *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 451 (1st Cir. 2009) (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 (1976)).  But a claim of disparate treatment "must rest

---

[30] Plaintiff testified—as a non-responsive comment to a question on a different topic—that "Shareice [Perry] had told me there were a number of investigations that John Laing had conducted regarding the Brooke. That John Laing wanted to support those investigations regarding racism.  Shereice's exact words were, after a meeting with Harry those allegations were somehow unsubstantiated."  (Fournier Dep. at 164).

on proof that the proposed analogue is similarly situated in material respects" to support a finding of unlawful animus. *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996). Courts must consider whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Id.* (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). The record does not demonstrate that is the case here.

Plaintiff again cites to deposition testimony in support of claimed facts that are not, in fact, supported by that testimony. For example, she contends that "[a] consultant was brought in to investigate Burlingame's department." (Pl. Mem. at 18 (citing Conlon Dep. at 95)). But in fact, Conlon testified that he does not know "whether [a consultant] was hired to do an assessment regarding Craig Burlingame and his management style." (Conlon Dep. at 95). Likewise, again citing to Conlon's deposition, plaintiff contends that Burlingame did not engage in any oppositional activity. (Pl. Mem. at 18 (citing Conlon Dep. at 67-69)). But Conlon testified that he had "no knowledge" whether Burlingame ever "opposed racism at the trial courts." (Conlon Dep. at 68-69).

Similarly, citing Conlon's deposition testimony, plaintiff contends that Fox "was found to have been aggressive and inappropriate towards [her], and was not fired." (Pl. Mem. at 18). Conlon testified that "[plaintiff] mentioned something [at a meeting], and Mr. Fox did not want that to be discussed there. [Plaintiff] continued, and Mr. Fox swore at [her]." (Conlon Dep. at 72). While he acknowledged that it was not "acceptable conduct," he testified that he did not know whether Fox was disciplined as a result. (*Id*. at 72-73). Plaintiff further contends, but without any citation to the record, that "there is no record of Fox opposing discrimination." (Pl. Mem. at 18). Particularly considering the extent and nature of the allegations in the Ripples

32

report, plaintiff has failed to produce sufficient evidence to show that she is "similarly situated in material respects" to Burlingame or Fox.  *See Perkins*, 78 F.3d at 751.

Furthermore, there is in fact evidence that another Trial Court employee—Sybil Martin— reported the discriminatory remark the day after plaintiff undertook her protected conduct.  (Def. Ex. 16).  Martin was not demoted or terminated after reporting the comment.  (Berrios Dep. at 37-38; *id.* at 22-23).  In fact, if she experienced any employment action, it was a promotion:  she is now one of two acting Co-Directors of Support Services (*id.*), even though she was a senior manager of Support Services when she reported the discriminatory comment.  (Def. Ex. 16). The disparate treatment of Martin and plaintiff, when both undertook essentially identical protected activity, substantially undermines plaintiff's contention that defendants' justification for her termination was pretextual.

In short, even accepting her version of events, the record does not support a finding that she suffered disparate treatment when compared to similarly situated employees.

### d.    Alleged Inappropriate Conduct of Decisionmakers

Plaintiff finally contends that the misconduct of the decisionmakers during and after the termination process demonstrates that their justification for her termination is pretextual. Specifically, she contends that Spence, Bello, and Conlon all lied during their depositions (Pl. Mem. at 11-13); that Spence prohibited individuals from putting things in writing (*id.* at 14); that defendants provided shifting explanations for her termination (*id.* at 16-17); and that they failed to follow ordinary procedures (*id.* at 14-16).  But either those claims are not supported by the record or the conduct was immaterial to her termination.

### (1)    Alleged Lies in Depositions

Plaintiff first contends that Spence, Bello, and Conlon all lied under oath during their depositions.  (Pl. Mem. at 11-13).  It is true that a false explanation for an adverse employment

action can support a finding of pretext.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of

discrimination from the falsity of the employer's explanation." (emphasis omitted)).  But that is

not what plaintiff is arguing; instead, she contends that because Spence, Bello, and Conlon lied

about certain matters in their depositions, they are therefore untrustworthy, and their testimony

cannot be credited as a general matter.

At the summary-judgment stage, the Court cannot make credibility determinations, and

must view the evidence in the light most favorable to the non-moving party.  The Court therefore

cannot reach a conclusion as to whether a particular witness is telling the truth.  Nonetheless, it

will address plaintiff's principal claims, all of which provide little, if any, support for the

proposition that the reasons given for plaintiff's termination were pretextual.

First, plaintiff contends that Spence lied in his deposition about whether he knew during

the meeting on March 31 that she had engaged in protected activity the day before.  (Pl. Mem. at

12).  Specifically, she contends that Spence testified that he did not remember what was

discussed with Laing in their March 31 meeting, but then said that he knew it did not involve

plaintiff's report; according to her, that is a contradiction demonstrating that he lied.  (*Id.*).[31]  As

noted, the Court is assuming for present purposes that Spence was aware of the protected activity

as of the March 31 meeting.

Second, plaintiff contends that Spence "lied about the contents of his own [April 10]

letter."  (Pl. Mem. at 12).  That letter stated, "The result of these often unprofessional behaviors,

---

[31] For what it is worth, it is far from clear that that is contradiction; it is commonplace for a person not to remember what happened, but to be able to identify with certainty that something did not happen.  For example, a person may not remember what they ate for breakfast a week ago, but if asked whether it had been birthday cake, could state with certainty that it was not.  In any event, the Court will not resolve the issue here.

if substantiated, is that your ability and capacity to lead the department with credibility and the

respect of your peers and subordinates have been irreparably harmed." (Pl. Ex. O). At his

deposition, counsel and Spence sparred about the meaning of "substantiated"; Spence testified, in

substance, that plaintiff was given an informal hearing after the writing of the letter to provide

"rebutting evidence to test that substantiation." (Spence Dep. at 86-88). That dispute is trivial,

at best, but in any event the letter itself is part of the record, and the Court will assume that

plaintiff had not had a full opportunity to respond to the claim of unprofessional behavior as of

April 10.

Plaintiff next claims that Bello "lied about his communications with Spence." (Pl. Mem.

at 12). In his June 16, 2017 letter to Williams recommending removal of plaintiff from her

position, Bello stated that "[a]s a result of [Bello's] position in the Trial Court, Mr. Spence and

[Bello] consulted on this matter and the on-going discussions [Spence] had with Mrs. Fournier

many times." (Pl. Ex. X at 3 n.1). When asked in his deposition whether he spoke with Spence

before he retired about plaintiff's "termination," Bello testified that he "only spoke about the . . .

paid administrative leave letter." (Bello Dep. at 19). It is far from clear whether those

statements are contradictory, and if so which version favors plaintiff; but again the evidence will

be viewed in the light most favorable to her.[32]

Plaintiff finally contends that Conlon lied at his deposition when he described being

moved from Director of Human Resources to Deputy Director of Labor Relations. (Pl. Mem. at

13). Conlon referred to his new job as "more [of a] lateral" move," whereas Spence described it

---

[32] Again, those statements are not obviously contradictory. Plaintiff's "termination" and "this matter" are
not necessarily the same thing; for example, Spence and Bello could have discussed plaintiff's behavior and
performance issues at length without discussing her termination. Furthermore, even if Spence and Bello spoke
"only" about the administrative leave letter, that does not necessarily mean that they spoke only on one occasion.

as "probably a demotion." (Conlon Dep. at 31-32; Spence Dep. at 40). That discrepancy, if any, is completely unrelated to plaintiff's termination and is surely immaterial.[33]

In short, plaintiff's claims that Spence, Bello, and Conlon all lied in their depositions offer, at best, little support for the proposition that defendants' justification for plaintiff's termination was pretextual.

### (2)   Spence's Alleged Preference for Non-Written Communications

Plaintiff next contends that "Spence had a policy of not allowing his direct reports to put potentially damaging information in writing because he did not like paper trails." (Pl. Mem. at 14). That claim is based on two cited sources: plaintiff's own conclusory deposition testimony[34] and an irrelevant e-mail from Habip created in the course of this litigation.[35] But even assuming the truth of that statement, it is not affirmative evidence that defendants have offered a pretextual reason for her termination. Plaintiff contends that it is relevant because "[t]his is why there is no paper trail of Conlon's report to Spence of [her] oppositional activity" prior to the March 31, 2017 meeting. (*Id.*). But because Spence's knowledge at the time of that meeting is a disputed fact, the Court assumes it in her favor anyway. Spence's alleged preference for non-written communications, which is largely unsupported, is therefore immaterial.

---

[33] Plaintiff speculates that "Conlon is denying notifying Spence about [her] oppositional activity because he fears a further retaliatory demotion and/or termination from Williams as a result." (Pl. Mem. at 13). But "[e]ven in retaliation cases, 'where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007) (quoting *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003)). Accordingly, the Court will not rely on plaintiff's unsupported speculation.

[34] According to plaintiff, "[Spence] wanted nothing in writing. He didn't want anything. He didn't want a paper trail on anything. He didn't like paper. He didn't want paper." (Fournier Dep. at 177).

[35] The Habip e-mail was sent in October 2019 to counsel for plaintiff in the course of this litigation when Habip was producing his e-mails. It states, "The 'legal matter' some emails refer to is the suit Trial Court/Maria had at the time with external interpreters. There was a deliberate effort not to have too much in writing as it could be discoverable in that suit." (Pl. Ex. Y). In the same e-mail, Habip notes that Spence "is not a fan of e-mail[;] [Spence] prefers talking in person." (*Id.*). The former comment concerns a policy as to a specific pending lawsuit, and the second concerns Spence's communication preferences generally.

### (3)     **Defendants' Alleged Shifting Explanations**

Plaintiff next contends that defendants provided shifting explanations for her termination. (Pl. Mem. at 16-17).  Specifically, she contends that defendants originally relied exclusively on the Ripples Group report as the basis for her termination, but after this litigation started, they began to rely on other evidence, including allegations from Sheriece Perry (plaintiff's deputy, who complained that plaintiff did not delegate tasks and was a poor communicator) and Spence (who testified that plaintiff had once "yelled at" an attorney).  (*Id.*).

"The fact that the employer gave different reasons at different times for its action surely supports a finding that the reason it ultimately settled on was fabricated."  *Vélez*, 585 F.3d at 449 (reviewing evidence of pretext for claim under the Age Discrimination in Employment Act).  But here, there is no evidence that the reasons given for plaintiff's termination have shifted. According to the evidence, defendants have stated consistently that she was terminated for performance and behavior deficiencies.  The other evidence she identifies—which is in addition to and entirely consistent with the Ripples report—simply represents specific examples of the more general allegations.

In *Vélez*, the First Circuit found that the employer's shifting explanations for the employee's termination supported finding that the employer's justification was pretextual.  *See id.*  The employer first did not provide the employee with any reason for his termination.  *See id.* One month later, the employer informed governmental agencies that the employee was fired for violating the employer's policy on receiving gifts from suppliers.  *See id.*  And more than a year later, the employer said that the employee had been fired for stealing and selling company property.  *See id.*  The employer did not simply rely on new evidence to support its proffered justification; each time, it put forth an entirely new justification.

By contrast, here, defendants have consistently maintained that plaintiff was fired for

performance and behavior issues, even if they have offered additional (non-contradictory) evidence in support of that explanation.  There is no basis to conclude, on this record, that their explanations have shifted.

### (4)      Defendants' Alleged Failure to Follow Normal Procedures

Finally, plaintiff contends that defendants' alleged failure to follow the normal procedures of the Trial Court is evidence of pretext.  *See Brennan v. GTE Gov't Sys. Corp.*, 150 F.3d 21, 29 (1st Cir. 1998) (finding that evidence company deviated from standard procedure that resulted in plaintiff's termination demonstrated pretext).  Specifically, she contends that "Spence deviated from ordinary evaluation procedures" by not putting her on an employee performance action plan; that her "internal hearing was a sham in violation of policy"; and that "Trivedi knowingly deviated from Trial Court policy."  (Pl. Mem. at 14-15).

First, she contends that Spence did not follow court policy because he was "required to put her on notice with an Action Plan in her performance evaluations" if he believed she had "serious performance deficiencies."  (*Id.* at 15 (emphasis omitted)).  She further argues that Spence's actions were "irrational" and "inconsistent with [his] prior positive performance reviews."  (*Id.*).

As evidence of the relevant court policy, plaintiff points to her 2015 and 2016 performance reviews.  (*See* Pl. Ex. B; Pl. Ex. C).  The review forms state that as part of the annual performance review, "managers must . . . sit down with each employee to develop goals and objectives with an action plan to accomplish them."  (Pl. Ex. B at 11; Pl. Ex. C at 11).  And "[f]or employees with serious performance deficiencies, the manager must put the employee on notice that his or her performance is deficient, and without improvement, he or she may be subject to disciplinary action."  (*Id.*).  Although the actual Trial Court policy does not appear to be part of the record, the Court will assume that the review forms reflect a policy that was in

effect in April 2017.

There is, however, another part of the policy that is in the record.  Section 16.500 of the

Trial Court personnel manual addresses the discipline or removal of management employees.

(Pl. Ex. Q § 16.500).  That section provides as follows:

> The appointing authority must provide a written explanation of the grounds for
> the proposed discipline, which may include a warning, suspension, probation,
> demotion or removal. . . .
>
> For discipline above a written reprimand, the appointing authority must provide
> the employee with notice of the charges, hold an informal hearing with the
> employee within a reasonable time to discuss the behavior or job performance,
> discuss the proposed discipline and provide the employee with an opportunity to
> respond, either orally or in writing.  If the hearing and/or the employee's
> written response does not resolve the matter, the appointing authority must
> make a final determination of the discipline to be imposed, if any. . . .  If the
> appointing authority decides to remove (terminate) the employee, the employee
> shall be placed on paid or unpaid administrative leave as determined by the
> Human Resources Department pending the review by the Court Administrator.

(*Id.*).

The record indicates that the Trial Court followed the procedure set out in § 16.500:

Spence provided a written explanation of the grounds for the proposed discipline (Spence Aff.

Ex. E; *see also id.* ¶ 30 & Ex. F); he provided notice of the charges (*id.*); Bello held an informal

hearing with plaintiff to discuss her job performance (Bello Aff. ¶ 15); plaintiff was provided

with opportunities to respond, both in person (*id.* ¶ 16) and in writing (*id.* ¶ 17); and plaintiff was

placed on administrative leave pending review (Spence Aff. ¶ 30 & Ex. F).

It is unclear from the record how the policies concerning employee performance review

and employee discipline are intended to interact.  It is apparent that Spence viewed the issues

concerning plaintiff as involving both misconduct and poor performance; thus, for example, his

April 10 letter indicated that he had received information concerning her "unprofessional

behaviors," specifically that she had been "inappropriately adversarial with a wide variety of

colleagues and subordinates" and had "demonstrated a lack of professionalism in those encounters, with the result that many of [her] colleagues and subordinates have been met with [her] unreasonable anger, arbitrary decision-making, inability to listen and impenetrable obstinacy." (*Id.* Ex. E). Similarly, his April 14 letter placing her on administrative leave states that he was taking that action "as a result of reports received by [his] office that [her] behavior and job performance have been unsatisfactory and are hindering the operational needs of the Court." (*Id.* Ex. F).

There is no evidence in the record that it was Trial Court policy to put an employee on a plan to improve his or her job performance even if the employee had engaged in workplace misconduct. Furthermore, that would be an odd policy, as it would prevent the Trial Court from immediately disciplining or terminating someone who had committed a serious workplace offense. Under the circumstances, and based on the record before it, the Court cannot conclude that the Trial Court deviated from its ordinary procedures, much less that such a deviation is evidence of pretext.

Next, plaintiff contends that her internal hearing was a "sham in violation of policy." (Pl. Mem. at 15). She argues that Spence's deposition testimony "establishes the internal hearing was a sham – it was not designed for her to meaningfully respond to the allegations made against her as the Trial Courts' policy requires," and that Spence "even admitted" as much. (*Id.* (citing Pl. Ex. Q § 16.500; Spence Dep. at 88-93)). She further argues that her "ability to gather evidence was hindered by the Defendants because Trial Court employees were instructed, in writing, that they were not permitted to have contact with her," and "[w]orse, her name plate was removed and the locks to her office door were changed, indicating to any objective juror that she had no chance of returning." (*Id.*).

Plaintiff again misrepresents the evidentiary record.  Spence never "admitted" that the internal hearing was a "sham," or anything of the sort.  (*See id.* at 15).  He testified that the hearing "is a far more informal proceeding [than a criminal proceeding or a court proceeding].  The employee has an opportunity to speak to the issues that the employer has identified . . . ."  (Spence Dep. at 88-89).

The contention that trial court employees were instructed not to speak to plaintiff is based on an e-mail from Sheriece Perry, a deputy administrator, to her work group on April 24, 2017, stating that "we are unable to communicate with [plaintiff] at this time."  (Pl. Ex. AA).[36]  Even assuming that the recipients interpreted that as a directive not to speak with plaintiff, she has offered no evidence that she actually attempted to contact witnesses and was rebuffed, or that her ability to gather information for the hearing was in any impaired.  And there is no evidence in the record that the removal of her name plate or the changing of her locks after her suspension represented a deviation from ordinary procedures when an employee is suspended.

Plaintiff's final contention is that "Trivedi knowingly deviated from Trial Court policy" when she conducted her internal investigation.   (Pl. Mem. at 15-16).  She does not specifically identify which policy Trivedi is claimed to have violated; nonetheless, it appears that her principal complaints are that Trivedi's report exceeded the scope of her authority and that she conducted no separate investigation.  (Conlon Dep. at 79-83).

Trivedi was given the task of investigating plaintiff's complaint that Spence retaliated against her for reporting discrimination and harassment at the Trial Court.  (Pl. Ex. S at 1).  Her report includes a section examining whether it was a "legitimate business decision to remove

---

[36] According to the exhibit submitted by plaintiff, the e-mail was not approved or reviewed before it went out, and senior managers were subsequently instructed "that they and their staff are welcome to speak to [plaintiff] if they so choose."  (Pl. Ex. AA).

[plaintiff] as Director of Support Services." (*Id.* at 15-16). Conlon, in his deposition, suggested that by addressing that issue Trivedi might have exceeded her authority. (Conlon Dep. at 83-84). But whether the employer had legitimate grounds for termination is surely an appropriate consideration during an investigation into a claim of retaliation. If an employer does not have a legitimate business basis to take an adverse employment action, that action is more likely retaliatory. And, indeed, Trivedi testified that because her investigation was focused on whether there had been improper retaliation, it included consideration of whether the stated reason for the adverse employment action was pretextual. (Trivedi Dep. at 47). It is difficult to see what was improper about that course of action. And plaintiff points to no Trial Court policy that Trivedi may have violated by including that section in her report.[37]

Plaintiff also suggests that Trivedi deviated from standard policy when she (and Bello) failed to investigate the allegations in the Ripples presentation.[38] Again, the portions of depositions that plaintiff identifies do not support that proposition.[39] And, in any event, even if Trivedi failed to investigate the facts underlying the conclusions of the Ripples report, it is again unclear from the record what Trial Court procedure that violates.

In short, there is no basis to conclude that defendants violated their internal policies and

---

[37] In any event, it is unclear whether Trivedi's report served as a ground for plaintiff's termination. Bello's letter to Williams that recommended plaintiff's termination was sent the same day Trivedi's report was issued and did not refer to the report's conclusions. (*Compare* Pl. Ex. X at 1, *with* Pl. Ex. S at 1). Likewise, Williams did not refer to Trivedi's report when describing the basis for the final termination decision. (*See* Def. Ex. 30).

[38] Plaintiff's contention that Trivedi did not adequately investigate the basis for her termination contradicts her contention that Trivedi exceeded the scope of her authority by reporting on the basis for that termination. Plaintiff tries to reconcile that contradiction by speculating that Bello and Spence directed Trivedi to include the allegations in her report. (*See* Pl. Mem. at 16 ("Defendants had Trivedi compile a section in her investigation report documenting the legitimacy of Spence's decision to terminate Fournier, which they could then pretextually use to bolster Spence and Bello's pretextual decision.")). Plaintiff cites no evidence to support that theory, which appears to be based entirely on conjecture. *See Vives*, 472 F.3d at 21 (quoting *Benoit*, 331 F.3d at 173).

[39] Moreover, there is contrary evidence in the record: Bello's affidavit states that "[b]etween April 14, 2017 and June 2, 2017, [he] spoke with managers and staff interpreters who provided information consistent with the statements gather by The Ripples Group." (Bello Aff. ¶ 19).

therefore that the reason given for the termination was pretextual.

## IV.  <u>Conclusion</u>

In summary, the undisputed evidence shows that Trial Court management had received substantial, indeed overwhelming, information concerning plaintiff's unacceptable workplace behavior and performance before she engaged in protected activity.  Plaintiff has not put forth sufficient evidence, even when considered as a whole, that would enable a reasonable factfinder to conclude either that defendants' stated reason for her termination was pretextual or that the real reason for defendants' action was retaliatory animus.  *See Ray*, 799 F.3d at 113-14, 114 n.9. To conclude otherwise would allow an employee, "no matter how poor [her] performance . . . to inhibit a well-deserved discharge" by undertaking protected activity to preserve her job. *Mesnick*, 950 F.2d at 828.

For the foregoing reasons, defendants' motion for summary judgment is GRANTED.

**So Ordered.**

<u>/s/ F. Dennis Saylor, IV</u>
F. Dennis Saylor, IV
Dated:  November 2, 2020                                    Chief Judge, United States District Court