1

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    MARIA FOURNIER,                    )
                                        )
5                        Plaintiff      )  Civil Action
                                        )
6                                       )  No. 18-10865-FDS
     vs.                                )
7                                       )
     COMMONWEALTH OF MASSACHUSETTS,     )
8    et al.,                            )
                         Defendant

9

10

     BEFORE:  CHIEF JUDGE F. DENNIS SAYLOR, IV
11

12

13

14                       MOTION HEARING

15

16        John Joseph Moakley United States Courthouse
                     Courtroom No. 10
17                   1 Courthouse Way
                     Boston, MA 02210
18

19                     March 6, 2020
                        10:04 a.m.
20

21

22

23             Valerie A. O'Hara, FCRR, RPR
                  Official Court Reporter
24    John Joseph Moakley United States Courthouse
                  1 Courthouse Way
25                Boston, MA 02210
               E-mail: vaohara@gmail.com

1   APPEARANCES:

2   For The Plaintiff:

3        Gordon Law Group, LLP, by BENJAMIN FLAM, ESQ.,
    585 Boylston Street, Boston, Massachusetts 02116

4

    For the Defendant:

5

        Office of the Attorney General, Insurance & Financial

6   Services, by J. DAVID HAMPTON, ESQ., One Ashburton Place,
    Boston, Massachusetts 02108.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.  Thank you.  All rise.

2     Thank you.  Please be seated.  Court is now in session in the

3     matter of Fournier vs. Commonwealth of Massachusetts, Civil

4     Action Number 18-10865.

5          Would counsel please identify themselves for the

6     record.

7          MR. FLAM:  Good morning, your Honor, Benjamin Flam for

8     the plaintiff, Maria Fournier.

9          THE COURT:  Good morning.

10:04AM 10          MR. HAMPTON:  Good morning, David Hampton for the

11     defendant Trial Court and the defendants in their official

12     capacity.

13          THE COURT:  All right.  Good morning.  This is a

14     hearing on defendant's motion for summary judgment.

15     Mr. Hampton, I think it's your motion.

16          MR. HAMPTON:  It is, your Honor.  I also filed a

17     motion to strike certain of defendant's statements.  Shall I

18     lead with that one because I think some of that is probative of

19     the more general summary judgment motion?

10:05AM 20          THE COURT:  You can fold that in or submit on the

21     papers as you see it.

22          Okay.

23          MR. HAMPTON:  As to our motion for summary judgment,

24     there are two claims in this case.  There's a Title 7 claim for

25     retaliation, and there is a claim under the Massachusetts

1    Whistleblower Act.  The facts briefly stated are that

2    Maria Fournier was the director of support services for the

3    Massachusetts Trial Court System, which meant that she oversaw

4    various administrative functions of the Trial Court.

5         It's undisputed that among them is the Office of Court

6    Interpreter Services, which was experiencing problems before

7    she came and continued to experience problems while she was

8    there.

9         It's also undisputed that in January of 2017, the

10:06AM 10    Trial Court put out a request for bids to solicit an outside

11    consulting firm to come in and evaluate the Office of Court

12    Interpreter Services.  The engagement was given to the

13    Ripples Group and in particular, one of its co-heads,

14    Attila Habip.

15         THE COURT:  I have to ask, is that someone's last name

16    or is this Ripples?

17         MR. HAMPTON:  No, I believe it's something to the

18    effect of Ripples making waves.  I don't believe it's someone's

19    last name.

10:06AM 20         THE COURT:  Okay.

21         MR. HAMPTON:  The engagement called for him to come in

22    and to speak with Ms. Fournier and then a variety of

23    stakeholders.  He did so in those interviews, and the list of

24    witnesses are attached to his affidavit in defendant's

25    exhibits.

1           After discussing OCIS and Ms. Fournier's performance

2      generally, it's also undisputed that in mid-March, some time

3      before the end of March, he came to Ms. Fournier and said,

4      among other things, that he was receiving negative feedback

5      about her.

6           He continued to conduct interviews, and then on under

7      March 17th made the first of several presentations to the

8      senior management of the Trial Court, among them containing the

9      slides that are in Defendant's Exhibit 6 at page 28 and 29,

10:07AM 10    which identify four serious domains of issues with

11     Ms. Fournier, among them, poor communication with staff and

12     field, defensive behavior, inability to delegate and

13     micromanagement, and overall loss of trust with th an e

14     department.

15          It's also undisputed that all this took place before

16     Ms. Fournier's protected conduct on March 30th.  Also

17     undisputed is an e-mail that he received from an ex-employee

18     named Vanessa Dillon highlighting many of these concerns and

19     following up on an interview that he had conducted with her.

10:08AM 20    That's at Defendant's Exhibit 7.

21          Also undisputed is an e-mail from the Chief Judge of

22     the Massachusetts Trial Court, Paula Carey, saying that she

23     didn't believe that Ms. Fournier understood the severity of the

24     situation.

25          So, the basis of our motion is simply the timeline,

1    the timeline of events.  All of these things took place before

2    Maria Fournier's protected conduct, and on the basis of this,

3    it's impossible -- it's impossible to get beyond the legitimate

4    stated reason for the termination because in order for this to

5    be false, in order for this to be pretextural, all these things

6    would have had to have been manufactured in advance.

7         The Trial Court would have had to know that she has

8    going to engage in protected conduct on March 30 back in

9    January, two months earlier, when it first sent out the

10:09AM 10   engagement, back when Ripples accepted it, back when the

11   interviews were conducted, and back when the startling

12   feedback about Ms. Fournier's performance was first given to

13   the Trial Court on March 17th.

14        Now, in a different case, it might be that an

15   investigation like this is conducted and yields more equivocal

16   results about her performance, saying if Ripples had conducted

17   an investigation and had found out that she was occasionally

18   late or something like that, then I suppose it would be

19   plausible for her to argue that while the findings may be what

10:10AM 20   they are, they can't fully explain why she would be removed

21   from her position, that something else might have been afoot,

22   but this is not that case.

23        These are grave and profound concerns about her

24   performance that are identified by an outside party and

25   presented to the Trial Court before she engages in her

1    protected conduct.

2         To think that this is manufactured or fake, the Trial

3    Court would have had to have known in advance and set these

4    wheels in motion before they even knew about her protected

5    conduct.  It would just put the cart before the horse.

6         Another point I'd like to highlight is the fact that

7    it's also undisputed that the same protected conduct that

8    Ms. Fournier engaged in, it's undisputed that it was also

9    engaged in by her then senior manager, by a person by the name

10:11AM 10   of Sibyl Martin.  It's at our Statement of Fact Number 43.  She

11   engaged in the same protected conduct at roughly the same time.

12         THE COURT:  Meaning reporting the remark?

13         MR. HAMPTON:  Yes, and not only was she not

14   terminated, but she is now one of the acting co-directors of

15   that department, and so you have a clean comparison there

16   between two people who engage in the same conduct, and it's

17   only Ms. Fournier that is actually removed suggesting that that

18   is obviously not what animated the Trial Court, it's the

19   findings that were presented by the Ripples Group.

10:11AM 20        Understanding the facts of this timeline and how they

21   lead to the conclusion that it's the Ripples findings that

22   actually prompted her removal rather than the protected conduct

23   on March 30, they seek to dispute several of the steps in our

24   chronology, which we submit is without basis.  Some of these

25   are disputed simply because they're declared to be affidavits

1    on behalf of interested witnesses.

2         As we argue in our motion to strike, there's no

3    foundation in the law for disregarding undisputed sworn

4    testimony simply because it's by someone who might have an

5    interest in the litigation.

6         Others are disputed because there is a difference in

7    pagination between the two key slides as they were presented on

8    March 17 and then as they were later sent to her in connection

9    with her disciplinary process.

10:13AM 10    The small numbers on one say I believe 28 and 29, the

11   others say I believe 21 and 22.  I'll know that there's no

12   contention in the record that there was only one presentation

13   given.

14        The only contention is that Mr. Habip identified this

15   as the presentation, the one that is attached at Exhibit 6 that

16   was given on March 17, nor is there any contention made in the

17   letter that attached those two slides later in April that it

18   was from that same presentation.

19        It says, "These are two slides from a presentation

10:13AM 20   given by the Ripples Group," so there's no contradiction

21   between the slides as they were presented in Exhibit 6 and then

22   as they are shown in plaintiff's exhibits.

23        Moreover, pagination issues alone would not explain

24   why it would be permissible to then infer that the interviews

25   did not take place, that the people did not say the things they

1    were alleged to have said, that the presentation wasn't given

2    on the date Mr. Habip said he gave it, two weeks before the

3    protected conduct.  None of that can be parlayed into

4    speculative inferences like that.

5         In response to our motion for summary judgment,

6    obviously, we're relying simply on the timeline, and, in

7    response, there's a lot of volume in the opposition trying to

8    create issues where I would suggest none really exist, and if

9    they are, they are not material to this case.

10:15AM 10    I could go through and catalogue the various points in

11    the opposition at which the evidence that's cited doesn't

12    actually support the claim that is made in the opposition, but

13    I don't think that's specifically necessary.  Suffice it to

14    say, they have four arguments in response.

15         One is that explanations for the justification for

16    Ms. Fournier's removal changed over time.  They did not.  The

17    domains and issues that were identified in the Ripples Group

18    were communication, delegation, loss of trust, defensive

19    behavior were the same that were presented to her during her

10:15AM 20    disciplinary process, and they were same bases on which the

21    ultimate decision to terminate her was made in August 2017.

22         The fact that more people came forward to validate

23    those same general categories of issues does not mean that the

24    bases changed, it simply provides further confirmation that

25    those were the reasons for the termination and that those were

1   well-founded.

2        The opposition cites to two instances in which it's

3   maintained that the Trial Court added additional bases, one is

4   about an incident about yelling, one is drawn from the answers

5   to interrogatories.

6        Mr. Flam in those instances asked different questions

7   and got different answers.  The questions that prompted those

8   were not what are the reasons for the Trial Court's termination

9   of Ms. Fournier.  One asked what are any instances of

10:17AM 10  under-performance that the Trial Court is aware of.  That's not

11  the same question.

12       We all fall short at different times, and that doesn't

13  mean that that necessarily informs the basis for an adverse

14  employment action.  If you ask all of the instances of

15  under-performance, you're going to get more than what the

16  actual reasons for the termination are.

17       There's also a yelling incident that's cited in the

18  opposition.  Obviously, in our papers at no point do we

19  maintain that that was a basis for the termination.  That was

10:17AM 20  simply prompted in response to a question where the former

21  court administrator was asked:  "Are you aware of any instances

22  of Ms. Fournier yelling at someone?"  And that prompted that

23  answer.  That doesn't suddenly make it a reason for the Trial

24  Court's termination.

25       A better illustration of what shifting explanations

1   actually look like, the kind that can give rise to a jury

2   question is in the case of Aless, which they cite in support of

3   it.  In that case, absolutely no reason was given for the

4   termination in the first instance, and then only a year after

5   the litigation had commenced was a reason first given, and that

6   reason on inspection was specious.  This has been the same

7   reason for the termination throughout.

8           Ms. Fournier also contends that her removal may have

9   been a foregone conclusion that the informal hearing did not

10:18AM 10  present her with the opportunity that she sought to rebut the

11  reasons and that she didn't believe that she was sufficiently

12  armed to change the Trial Court's mind.

13          That may well be true.  It's quite possible that

14  there's nothing that she could have said at the informal

15  hearing that would have overcome what the Ripples Group had

16  presented to the Trial Court.  That doesn't mean it's pretext

17  for discrimination.

18          A third basis that they cite in opposition is

19  allegations that the former court administrator was racist, was

10:19AM 20  discriminatory.  I would submit the citation there is

21  completely unsupportive of the allegation, and, even so, even

22  if it were accepted, that doesn't support the conclusion that

23  there was retaliation in this case.

24          I suppose, suffice it to say for now when an

25  independent consultant comes in and identifies that one of the

1    directors of the entire Massachusetts Trial Court system is

2    failing along a whole host of domains in their job and that

3    that failure is potentially unrecoverable, and all of that

4    happens before the protected conduct, it seems like that is

5    ample justification for summary judgment.  I'm happy to answer

6    any questions your Honor has at this time.

7            THE COURT:  No.  Let me hear from counsel for

8    plaintiffs.  Mr. Flam.

9            MR. FLAM:  Thank you, your Honor.  Defendant's entire

10:20AM  10    argument for summary judgment is based on one allegation that

11    Habip, the outside consultant, recommended terminating Fournier

12    before her oppositional activity.

13            Your Honor, by Habip's own hand, he contradicts that

14    statement.  Slide 45 of Exhibit G, the PowerPoint presentation,

15    calls for rebranding Fournier and support services, no mention

16    of termination whatsoever.

17            The only mention of terminating Fournier from Habip's

18    perspective comes after her protected activity.  That's

19    undisputed in the record, your Honor, so could a jury believe

10:21AM  20    his subsequent affidavit, which contradicts his own

21    presentation?  Sure, but a jury has got make that call,

22    respectfully, Judge, because the PowerPoint slide is

23    unambiguous.

24            It says, "Relaunch Fournier and support services."

25    Now, it's also undisputed in the record, your Honor, that

1    support services was a mess before Fournier was hired.  It

2    needed a complete overhaul.  That's undisputed in the record.

3    It's also undisputed in the performance evaluations that

4    Mr. Spence gave to Ms. Fournier that he appreciated and

5    acknowledged her courageous and brave attempts to manage that

6    big mess and acknowledged his understanding, Judge, that there

7    were a lot of hard feelings in the field because she did things

8    like make sure that interpreters weren't getting paid triple

9    for a day's work.

10:22AM 10       She cut the waste, and the hard feelings that were out

11   there in the field were clearly no known to Spence.  There were

12   no revelations.  First, he admits it in the performance

13   evaluations when he's lauding her performance, and, secondly,

14   Judge, there was an actual lawsuit filed by these individuals.

15       Spence was named as one of the defendants.  Of course,

16   he knew what was going on in the field.  There's no

17   revelations.  They brought in Ripples to get recommendations

18   how to clean it up.  Ripples' recommendations, Slide 45, Judge,

19   rebrand her, nothing about termination.

10:23AM 20       The termination doesn't come until after her

21   oppositional activity.  My Brother commented on a woman named

22   Sibyl Martin.  That's Exhibit Z to our papers, Judge, who

23   reported the same conduct.  Now, as is set forth in the record,

24   Mr. Spence had a well-known policy.  Anything legally related

25   that might relate to litigation, you're not allowed to put that

1    in writing.  Ms. Fournier testified to it.  Mr. Habip even

2    admitted that was the case, so Fournier's oppositional activity

3    happened on March 30th.  Within 24 hours, she's no longer fit

4    for duty.

5         Ms. Martin, who is a Latina and is thus different from

6    Ms. Fournier, who identifies as white, did it in writing in

7    violation of Spence's edict, so a jury could very easily find,

8    sir, that there's nothing they could have done to retaliate

9    against her because she went ahead and did it in writing.

10:23AM 10         Having said that, the trial courts make a big deal in

11   their undisputed facts of the fact that Fournier was a personal

12   hire of Mr. Spence.  They had worked together at the Department

13   of Children and Families, and a jury could easily find that her

14   oppositional activity he took personally.

15         Turning your Honor to our arguments, we do believe

16   that there's direct evidence here.  Mr. Spence admitted that

17   white men are privileged and racist, and that he identifies as

18   such.  He also on one hand testified about the allegation that

19   he and his efforts were far beyond that of any other court

10:24AM 20   system in the country to deal with race discrimination, yet he

21   was forced to admit that he considered the "N" word, that

22   racial slur, "a crude comment."

23         And when confronted with an employee, Leslie Girardi,

24   who used that racial slur towards people of color, he described

25   her as follows:  "Knowledgeable and capable, though apparently

1    also sometimes offensive."

2           When asked why she wasn't disciplined for using racial

3    slurs in the workplace, Mr. Spence stated that he was going to

4    retire in two weeks, however, that two-week period didn't stop

5    him from retaliating against Ms. Fournier, who was opposing

6    that kind of conduct, and, clearly, Mr. Spence supported

7    racists because Linda Madonis, who he himself, Spence himself

8    described as "the weakest deputy future court administrator in

9    the system."  He supported her for a Judgeship knowing that she

10   had racist proclivities.

11          Your Honor, we also know from the record that

12   Mr. Spence directed Heena Trivedi, the diversity officer, to

13   change findings to unsubstantiated for race discrimination

14   investigations.

15          Now, I will tell your Honor at page 10 of my

16   opposition brief, there is a miscite.  It reads:  "Trivedi did

17   his bidding in this regard," Exhibit T, at page 63 through 66.

18   Your Honor, that should be Exhibit I, my apologies to the

19   Court.  Exhibit I is the deposition transcript of Mark Conlon,

20   the former director of HR, in which he goes through with me at

21   deposition an investigation report where Ms. Trivedi describes

22   actually telling the individual, listen, you realize that your

23   actions have violated the Trial Court's policies here on

24   racism.  Yeah, I realize that.  Yet, in her conclusion, she

25   says that there's insufficient evidence to conclude that the

1   policies were violated.  That's sloppy.  That's evidence that

2   she actually changed her findings that a jury could find.

3        All of this evidence together, your Honor, if

4   believed, does indeed create a highly probable inference that

5   Mr. Spence had this forbidden bias, and we submit to the Court

6   that there is enough just on Mr. Spence's testimony alone to

7   get to the jury.

8        Having said that, your Honor, turning to what we will

9   call the mosaic categories, the circumstantial evidence

10:27AM 10   categories, there is a plethora of facts that require this case

11   to be submitted to a jury.

12        First and foremost, the defendants ignored the paper

13   trail.  They ignore slide 45 and instead seek summary judgment

14   by affidavit.

15        Now, what we know is that when defense witnesses or

16   those closely affiliated with them, like Habip, have serious

17   concerns about their credibility, the finder of fact has to

18   evaluate those, Judge, so if we look through the record, the

19   first thing we know is that Spence lied about his own

10:27AM 20   knowledge.

21        First, he says, I don't remember anything that

22   happened during the meeting with John Laing.  So I asked him,

23   "So you could have learned about the complaint then?"

24        "Oh, no, no, no, I know that didn't happen."  Suddenly

25   he remembered.  More importantly, your Honor, if we take a look

1    at Exhibit O, Exhibit O is the letter that Spence sent to

2    Fournier telling her that she has going to be removed from her

3    position, and that letter reads:  The result of these often

4    professional behaviors, if substantiated, if substantiated, his

5    own words, is that her ability to leave the department, you

6    know, is in question, however, at deposition, when I asked him,

7    "Are these substantiated, they're not substantiated, right,

8    your own letter says so, he contradicted his own letter, your

9    Honor, and said, "No, no, no, they were substantiated, that

10:28AM 10    just meant that she has going to get a hearing."

11           Then he described the hearing as she doesn't actually

12    get to respond to all of the allegations, she just gets to go

13    in and say I did a good job, which, of course, defendant's

14    papers fail to state but that violates the Trial Court's own

15    policies.  That's another category we'll get to is deviation

16    from their own policies.

17           With respect to Mr. Bello, who picked up the baton

18    when Spence retired, he's also caught lying.  He said at

19    deposition he only spoke with Mr. Spence about the

10:29AM 20    administrative leave letter for Fournier, Exhibit O, but if we

21    look to his decision, the recommendation that supported firing

22    Fournier, if you look at page 3, footnote 1, he says, quote,

23    Many times did he speak with Spence about this process.  Which

24    one is it, Judge?  These decision-makers have no credibility.

25    They're contradicting themselves.

1          The same goes for Mr. Conlon.  Mr. Conlon told

2     Fournier that he notified Spence of her whistle blowing

3     activity, the oppositional activity.  Why did he not own that

4     at deposition?  Well, the last time he refused to do something

5     he found unethical, he got demoted.  He was afraid, and I don't

6     blame him because he's close to retirement, but a jury could

7     evaluate that and see it as such.

8          Your Honor, another key fact in this case, which is

9     undisputed, is that a jury could take a look at Fournier's

10:30AM 10    performance evaluations and decide in her favor.  Those

11    evaluations, as I alluded to earlier, Judge, set forth several

12    things, and this is set forth in our papers, so I won't belabor

13    this process, but from 30,000 feet, your Honor, he lauded her

14    performance in the face of difficulty, in the face of change

15    and eliminating waste and corruption.

16          He recognized that there was pushback from the field

17    and a lot of people were upset by the courageous changes that

18    she made.  This is undisputed, so this notion that there was a

19    revelation is ridiculous.

10:30AM 20          Setting that aside, your Honor, pages 11 and 12 of

21    both performance evaluations leave no discretion.  They use the

22    word "must."  They read:  "For employees with serious

23    performance deficiencies, the manager must put the employee on

24    notice that his/her performance is deficient and without

25    improvement, he/she may be subject to disciplinary action."  It

1    calls for an action plan if there's any allegations of less

2    than good conduct, less than good performance.

3           This is required, and you'll see very clearly, your

4    Honor, that the performance evaluations contain no such

5    allegations and no such action plan, and that's because there

6    never were any performance deficiencies that warranted any

7    adverse action before her oppositional activity.

8           Your Honor, it's important to note that Sibyl Martin

9    was one of the two co-directors of support services.

10:31AM 10    Ms. Fournier in her role supervised six different departments

11    within the executive offices of the Trial Court, and the fact

12    that they now have co-directors of support services, a jury

13    could very reasonably find, Judge, that this indicates there

14    was not thought or planning behind her termination.  There was

15    no succession planning.

16           Why is that important, your Honor?  Because it's

17    evidence that this was a knee jerk reaction 24 hours after her

18    complaint to fire her and figure it out later.

19           Notably, the defendants do not oppose Fournier's

10:32AM 20    whistle blowing activity.  That element is not disputed here.

21    So what happens is they have a list of these allegations on a

22    PowerPoint slide that Spence admits are not substantiated.

23    Bello does absolutely nothing, he admits, to substantiate the

24    allegations.  What do they do instead?  They have Heena

25    Trivedi, the diversity officer, the same woman who has changed

1    her findings at Spence's request, write up a section that says

2    they have justification to fire her in her diversity report,

3    which she admits is a violation of the Trial Court's policies.

4         That's what they use to justify her termination, a

5    violation of their own policies.  And as I alluded to earlier,

6    your Honor, the notion that Mr. Spence espoused that this

7    hearing, this internal hearing process, was a sham and

8    Ms. Fournier was no entitled to evidence or to actually rebut

9    the allegations against her, that may be Mr. Spence's opinion,

10   that may be how it actually went down, but what's undisputable

11   is that that violates Section 16.500 of the Trial Court's own

12   policies.

13        Your Honor, with respect to shifting explanations, all

14   you've got to do is take a look at our briefing and

15   John Bello's deposition.  He says, "Fournier couldn't

16   delegate."  When confronted with evidence, he says, "Oh,

17   actually she could."  Then, you know, there's the allegation

18   that she refused to tell her direct reports what had happened

19   to another employee.

20        Your Honor, they're actually holding against Fournier

21   the fact that she refused to discuss a former employee's

22   confidential personnel information.  A jury could very

23   reasonably find those cannot be the real reasons and that this

24   is all pretext.

25        We also, your Honor, point out that two white men who

1    had no protected activity but had similar allegations levied

2    against them, no adverse employment actions there.

3           And, finally, your Honor, in our brief, we go through

4    the cat's paw theory because Mr. Williams based his decision on

5    Bello and Trivedi's work product, the retaliatory animus shifts

6    to him as well.

7           It's important, your Honor, and I'm wrapping up here,

8    that under the MWA, the Mass. Whistleblower Act, there's three

9    elements here, right?  First, there's the protected activity.

10:34AM 10   That's undisputed.  Second is the legitimate non-retaliatory

11   explanation.

12          Now, I would submit to the Court that the defendant's

13   explanation is not legitimate because it's based on a gross

14   deviation of slide 45.  Their entire explanation here, Judge,

15   is that we would have to go back in time and undo this thing

16   because they would have had to have a crystal ball and somehow

17   prophesied that Fournier would have filed a complaint.

18          The point is Ripples did come in, no one disputes

19   that, and Ripples did make recommendations as to how to fix

10:35AM 20   things.  No one disputes that, but the recommendation that they

21   made vis-a-vis Fournier is crystal clear.  It's slide 45.  It's

22   to relaunch her, not to terminate her.  That, of course, the

23   record indicates that didn't happen until after she engaged in

24   the whistle blowing activity.

25          With respect, your Honor, I'll turn now, if it's

1   acceptable to the Court, to the motion to strike.  Essentially

2   what they're saying is as follows:  Habip says something in his

3   affidavit, and, therefore, the Court must accept it as true, as

4   undisputed.

5            Here's the problem with that, your Honor.  The case

6   law as set forth in our briefs is very clear, when an

7   individual's credibility is so tarnished, as we have here, a

8   jury has got to take a look at it, so if we take a look, your

9   Honor, at the presentation itself, Habip says this is my

10  presentation.

11           Elizabeth Day, who is counsel for the trial courts,

12  has a different version of the presentation.  Could Habip's

13  statement be true that this was the presentation?  It's

14  possible, but it's not undisputed because it's a dispute

15  between their own witnesses, Judge.  It's not a simple

16  pagination error.  You don't change seven, eight pages in a

17  presentation by accident.  We're not talking about a one-page

18  difference, we're talking about what appears to be seven to

19  eight pages of content that's just evaporated with no

20  explanation why.

21           With respect to similarly, your Honor, to the amount

22  of interviews that Mr. Habip allegedly conducted, it's the

23  Trial Court's position, my Brother's position that because he

24  says something that's true.  Well, what do we know?  We know

25  that Mr. Habip has backfilled an explanation that in his

1    affidavit they were not, these interviews, formally documented.

2         Well, I submit to the Court, your Honor, they weren't

3    documented in any way, so we have no evidence to know they took

4    place.  We also know, Judge, that in his affidavit, I'm looking

5    at page 3 of the motion to strike memorandum, it reads, "The

6    Ripples Group interviewed almost 40 individuals."

7         It's a quote, but if we look at Trivedi and her

8    deposition, it's Exhibit T, Judge, at page 66, it says, "Habip

9    told her that it was 45 individuals."  Why can't this man get

10   it straight?  He's the one who did the interviews.  He doesn't

11   know how many he did.  He's giving different answers to

12   different people at different times, so, respectfully, the

13   Court just can't take his word for it, and, moreover, a jury

14   could look at this guy and say, and conclude reasonably he

15   can't even get his own story straight on how many interviews

16   there were.

17        And consider that as evidence of pretext, especially

18   where Habip is a de facto decision-maker because on April 6th,

19   Spence sent him a draft of Fournier's termination letter and

20   asked him and solicited his comments, which he gave.

21        There's just too many problems with each and every

22   witness' credibility for this to not be evaluated by a jury.

23        Returning finally, your Honor, to our argument briefly

24   before I sit, we have the issue of the name plate removal.

25        The Trial Court's position is it magically went

1    missing, and, you know, they just didn't get around to

2    replacing it.  Judge, they put this woman on administrative

3    leave, and they changed the locks to her office, they removed

4    the name plate from her door, approaching what was supposed to

5    be a fair and impartial attempt to have an informal hearing.

6         A reasonable jury could very easily find, Judge, I

7    submit, that when you take the name off someone's door and

8    change the locks, you've already made your decision, she's

9    gone, and she ain't coming back, and to the extent that a jury

10:39AM 10    found that, a jury would be finding a violation, another

11    violation of the Trial Court's own policies which entitle

12    Fournier to a hearing, a fair hearing before a decision is

13    rendered.

14         With that said, your Honor, I submit that there is a

15    plethora of evidence upon which a jury could quite easily

16    conclude that the reasons given for Fournier's termination are

17    nothing but retaliatory pretext, and we ask this Court to deny

18    the motion for summary judgment.  Thank you, your Honor.

19         THE COURT:  Okay.  Thank you.  Any response?

10:40AM 20         MR. HAMPTON:  Yes, please.  So there are two theories

21    of this case.  One, the Trial Court, is that they hired an

22    outside consultant who came in, talked to a variety of judges,

23    clerks, and court stakeholders, got terrible feedback and then

24    memorialized that and presented it to the Trial Court, the

25    Trial Court took action.

1          Their theory is that Ms. Fournier was informed that

2     one interpreter said a discriminatory and inappropriate remark

3     to another interpreter, that that remark was reported up

4     through the chain until she heard about it.  She sends an

5     e-mail -- she notifies, excuse me, the director of human

6     resources, and that caused this entire thing to happen, that

7     she reports that discriminatory comment, and that causes the

8     entire retaliatory conspiracy that they're alleging exists

9     here.

10:41AM 10         Most of my Brother's time was spent on things that

11    happened later in the case that deal with the disciplinary

12    process.  The only things he said to dispute the basic

13    elements of our case, the basic timeline of our case, is that

14    Attila Habip in this presentation only recommended relaunching

15    support services and Maria Fournier, not terminating her.  It's

16    not listed here.

17         The Trial Court has not maintained that Maria Fournier

18    was fired on the recommendation of the Ripples Group, she was

19    removed on the basis of the findings of the Ripples Group.  The

10:42AM 20  Ripples Group did not irrigate to itself the responsibility for

21    what to do with Ms. Fournier in light of these findings.  They

22    reported the findings.  Mr. Spence and Ms. Fournier engaged in

23    a series of conversations about how to deal with these and what

24    to do about her, her future with the Trial Court.  They

25    couldn't come to an agreement, and she was suspended and

1   ultimately removed.

2           The performance evaluations are not uniformly glowing,

3   but, more importantly, they were both written before the

4   March 17th presentation by the Ripples Group.  That's why the

5   Ripples presentation is revelatory.  There were underlying

6   concerns about her communication, her organizational skills,

7   her defensive behavior.  They are seeded throughout the two

8   performance evaluations that are in the record, but because

9   they were written before, all of these people had been talked,

10:43AM 10   to and all of this evidence had been compiled into the Ripples

11   findings.  Of course, they're not going to reflect the degree

12   and severity of what Ripples ultimately obtained by talking to

13   many, many people.

14           These performance evaluations were written about the

15   interactions between Spence and Fournier and Spence's

16   estimation of her strengths and weaknesses before the Ripples'

17   presentation.

18           In response to our motion to strike, my Brother said

19   that you can't accept affidavit testimony, even uncontradicted

10:44AM 20   when credibility is at issue.  None of the cases that he cites

21   in that section actually stand for that proposition.  They all

22   talk about the general allocation of the responsibility for the

23   Court, to assess credibility.  They do not talk about ignoring

24   uncontroverted testimony provided by an affidavit.  The only

25   case that they cite that comes close is a case called American

1    Guaranty Insurance v. Grant.  It's a District Court case in

2    which there was an affidavit provided and there was

3    circumstantial evidence that it was not true.

4         Key to the Court's decision there was that the movant

5    had the burden of persuasion at trial.  It says in the unusual

6    circumstances of this case and because the movant bears the

7    burden of persuasion at trial, I find in these unusual

8    circumstances that credibility should still be assessed by a

9    jury.  We do not bear the burden of persuasion at trial, so

10:45AM 10   even that case doesn't stand for the proposition he would like

11   it to stand for.

12        We did not submit affidavits that simply said, I,

13   Harry Spence, had no retaliatory animus, I, Attila Habip, had

14   no retaliatory animus, that are simply reflective of their own

15   assessment of their motive.  These are affidavits that verify

16   who, what, when, where and how that talk about times, dates and

17   the authentication of documents, and it's uncontroverted, but

18   because it's so fatal to their case, they have to attack it

19   somehow.

10:46AM 20        Now, I would suggest that there's nothing actually

21   there to controvert them.  One thing I should note about the

22   Mass. Whistleblower Act with apologies to the Court, as I was

23   preparing for this argument, I see that I may not have been

24   correct about the causation standard for the Mass.

25   Whistleblower Act.  Federal courts in interpreting that have

1    employed the motivating factor standard, the looser standard

2    import by Section in 1983.

3         When I looked at the Mass. Appeals Court case,

4    *Trychon*, that is cited in both of our briefs, it notes that the

5    Appeals Court, the Massachusetts Appeals Court had not been

6    called upon to actually figure out whether the motivating

7    factor standard is the appropriate standard or if, instead,

8    something stricter should be applied.

9         I think there is good reason to suggest that actually

10:47AM 10   might be a but for standard if Massachusetts appellate courts

11   were called upon to address that issue.

12        THE COURT:  But they still have not.

13        MR. HAMPTON:  To my knowledge, they still have not.

14   I'm happy to provide further briefing on why I believe

15   Massachusetts courts might ultimately find that it is the same

16   but for standard that applies to the Title 7 retaliation claim.

17   I'll leave it to your Honor whether you would like briefing on

18   that issue.

19        As to the pagination and the 40 witnesses, if there

10:47AM 20   was any reason to anticipate that these facts would be put into

21   question, we could have run out and gotten affidavits from the

22   interviewees saying I was in fact interviewed, I did talk to

23   Attila Habip, I did say negative things about Maria Fournier,

24   but there was no reason to believe that that could be

25   reasonably disputed, 1, because Attila Habip was not deposed in

1    this case and did not give any testimony suggesting the

2    contrary was true.

3         Ms. Fournier acknowledged that she wasn't there for

4    the interviews.  You have a host of circumstantial evidence

5    supporting the existence of the interviews, such as e-mails, an

6    e-mail from Vanessa Dillon referring to the interview, the fact

7    that the bid and the response to the bid both call for the

8    interviews, the fact that Maria Fournier acknowledged that she

9    met with Attila Habip in connection with these things.

10:48AM 10         It's not reasonably controverted, and so we didn't do

11   the unnecessary leg work to compound an uncontroverted fact.

12   It's also true that, as I said, there's no contention from the

13   Trial Court that this is the only presentation that the Ripples

14   Group made.

15        There are other presentations that were produced to us

16   by Ripples and produced to the other side, produced to the

17   plaintiff, a whole host of PowerPoint presentations, I think a

18   total of 20.  The pagination issue that they talk about, it

19   doesn't -- there's a difference between the pages in the letter

10:49AM 20   and in the slides, but the pagination does match up with

21   another PowerPoint that was produced to both parties in this

22   case.

23        Again, if it were reasonable to anticipate that this

24   difference in pagination could unright a whole host of critical

25   facts in this case, we could have provided affidavits saying

1   well, no, the pagination issue is easily explained, but it's

2   not reasonable to have anticipated to do so because although

3   there's a minor differencing in numbers between the pages, the

4   substance is exactly the same.

5          Maria Fournier was given slides that contained the

6   exact same information as the slides that were presented to the

7   senior management of the Trial Court.

8          There's no intention that that was the only

9   presentation that was made, and it has no factual basis in the

10:50AM 10   record as we both know it.

11          This case, ultimately, it's a pretext case.  That's

12   the stage that we're at.  They have to provide evidence to show

13   that the reason for the Trial Court's termination, the reason

14   given is not true.

15          An outside consultant -- it does not appear that they

16   dispute that an outside consultant group came in and made the

17   findings that are set forth in the presentation at pages 28 and

18   29.  It doesn't appear that they dispute that, and so how can

19   there possibly be pretext in this case?  This is ample

10:51AM 20   justification for the action that the Trial Court took, and to

21   to suggest that this is, in fact, not, and the real reason is

22   that Ms. Fournier made a report of a comment that another

23   person made a report of and that no action was taken against,

24   it borders on the absurd.

25          I would suggest despite all of the things that they

1    talked about, that Mr. Flam has alluded to over the course of

2    the disciplinary process, none of that actually impeaches the

3    key issue in the case, which is was this presentation made,

4    does it serve as justification for the actions that were taken,

5    and is there anything to suggest it was not this, and I would

6    submit there isn't, your Honor.

7              THE COURT:  Okay.  Last word quickly, Mr. Flam.

8              MR. FLAM:  Thank you, Judge.  You'll note, your Honor,

9    that my Brother respectfully has both disavowed and then

10:52AM 10   embraced Habip's recommendations.  It's one or the other.  The

11   bottom line, Judge, is that the performance evaluations

12   recognize the good, the bad and the negative effects in the

13   field with respect to the changes Fournier was making.

14              It's also undisputed that the six departments were a

15   mess before she got there, and what is disputed, Judge, what is

16   genuinely disputed is why and when the decision was made to

17   terminate Fournier.

18              The only evidence that's in the record is Spence's

19   performance evaluations, which don't give any action plans,

10:52AM 20   meaning everything was good enough, then you've got her

21   oppositional activity, which no one disputes she engaged in on

22   March 30th, and 24 hours later within the closest proximity in

23   time there is, she's getting fired.

24              With respect to the MWA standard, your Honor, it is

25   the lower standard.  It was the lower standard in Pierce, and

1   this district court has applied that same standard in

2   Bradley v. Cruz, 2017, U.S. District Lexis, 47873 in addition

3   to, I might butcher the name, Judge, *Amirault*, A-m-i-r-a-u-l-t,

4   *v. City of Malden*.  That's 335 F. Supp. 3d 111.

5        In both of those cases, the same standard was applied

6   and summary judgment was not given in cases just like these,

7   where there indeed is evidence that there's retaliatory

8   motivation, evidence that must go to a injury.  Again, your

9   Honor, it's critical to remember that my Brother just said this

10:54AM 10   whole case is very simple.  They brought in an outside

11   consultant, he made recommendations, and they acted on them,

12   but the recommendation itself Slide is different than what they

13   say it is.  45.  It's beautiful in its simplicity, relaunch

14   Fournier.  No one wanted to fire her until after she opposed

15   race discrimination.

16        Finally, your Honor, again, the notion that there's

17   any revelations here in the light most favorable to Fournier,

18   it's got to be evaluated by a jury because all the documentary

19   evidence is in favor of Fournier having her day in court, and

10:54AM 20   with respect to my Brother's allegations that there's no case

21   law supporting our position on the motion to strike, well, your

22   Honor, I mean, there's case law from the U.S. Supreme Court all

23   the way down to the Massachusetts Superior Court.

24        As we know, a jury evaluates credibility, and it's

25   very clear that at the summary judgment stage, the Court should

1    disregard, and this is on page 1 of my opposition, Judge,

2    ignore or dismiss evidence proffered by the moving party that a

3    jury might not credit.

4        Here we have affiants who up and down the line to an

5    individual all have critical cracks in their credibility.

6    Spence testified against the content of his own letter.  Bello

7    says I talked to Spence once, but his writing says I talked to

8    him many times.  Conlon says it's not a demotion; Spence says

9    it is.  Trivedi, the whole list of them, your Honor, every

10:56AM 10   single one of them, including Habip, who says that he

11   recommended termination when his written recommendation,

12   Slide 45 is relaunched.

13       Every single one of them has motive to lie and got

14   taught in those lies, so it's not as simple as name, rank and

15   serial number.  They're not just giving dates, they are not

16   just giving facts, they are establishing what they purport to

17   be their legitimate, non-retaliatory reason that the only

18   concern we have, your Honor, is that a jury has to decide

19   whether it was legitimate, and there's more than enough

10:56AM 20   evidence, overwhelming evidence that a jury could conclude in

21   the light most favorable to Fournier establishes retaliatory

22   pretext.  Thank you, your Honor.

23       THE COURT:  All right.  Thank you.  Thank you.  It was

24   well argued.  I'll take it under advisement.  Thank you.

25       THE CLERK:  All rise.

1         (Whereupon, the hearing was adjourned at 10:56 a.m.)

2

3               C E R T I F I C A T E

4

5  UNITED STATES DISTRICT COURT )

6  DISTRICT OF MASSACHUSETTS ) ss.

7  CITY OF BOSTON )

8

9         I do hereby certify that the foregoing transcript,

10  Pages 1 through 34 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Civil

12  Action No. 18-10865-FDS, MARIA FOURNIER vs. COMMONWEALTH OF

13  MASSACHUSETTS, et al. and thereafter by me reduced to

14  typewriting and is a true and accurate record of the

15  proceedings.

16         Dated November 30, 2020.

17

18                s/s Valerie A. O'Hara

19                _____

20                VALERIE A. O'HARA

21                OFFICIAL COURT REPORTER

22

23

24

25