1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
2

3    MARIA FOURNIER,                    )
                        Plaintiff,      )
4                                       )
     vs.                                )   No. 18-CV-10865-NMG
5                                       )
     COMMONWEALTH OF MASSACHUSETTS,     )
6                       Defendant.      )

7

8

9

10

                 BEFORE THE HONORABLE NATHANIEL M. GORTON
11                 UNITED STATES DISTRICT COURT JUDGE
                          JURY TRIAL - DAY 7
12

13

14

15          John Joseph Moakley United States Courthouse
                          Courtroom No. 4
16                        One Courthouse Way
                     Boston, Massachusetts 02210
17

18                         June 3, 2022
                             9:20 a.m.
19

20

21               Kathleen Mullen Silva, RPR, CRR
                        Official Court Reporter
22          John Joseph Moakley United States Courthouse
                     One Courthouse Way, Room 7209
23                   Boston, Massachusetts 02210
                     E-mail: kathysilva@verizon.net
24
             Mechanical Steno - Computer-Aided Transcript
25

```
 1    APPEARANCES:

 2

 3            Gordon Law Group, LLP

 4            Benjamin Flam, Esq.

 5            Philip J. Gordon, Esq.

 6            585 Boylston Street

 7            Boston, Massachusetts 02116

 8            617.536.1800

 9            for Plaintiff

10

11            Office of the Attorney General

12            Insurance & Financial Services

13            J. David Hampton, Esq.

14            One Ashburton Place, 18th Floor

15            Boston, Massachusetts 02108

16            617.963.2129

17            and

18            Massachusetts Attorney General's Office

19            Government Bureau/Trial Division

20            Nicole A. Eldredge, Esq.

21            One Ashburton Place, 18th Floor

22            Boston, Massachusetts 02108

23            for Defendant

24

25
```

1                    P R O C E E D I N G S

2            THE CLERK:  All rise.

3     (Court enters.)

4            THE CLERK:  Thank you.  You may be seated.  Court is

5     now in session.

6            THE COURT:  Good morning, counsel.

7            COUNSEL:  Good morning, Your Honor.

8            THE COURT:  Before I call the jury and allow you to

9     make closing arguments, I just want to pass out a verdict form

10    as to which I've made a slight change.

11           On the damages page I've combined two of the

12    paragraphs, the front pay and the benefits and pension.  So

13    there are three subparagraphs instead of four.  I just wanted

14    you to know that before we start.

15           All right.  Anything else that needs to come to my

16    attention before we commence the closing arguments?

17           Call the jury.

18           THE CLERK:  All rise for the jury.

19    (Jury enters.)

20           THE CLERK:  Thank you.  You may be seated.

21           THE COURT:  Good morning, jurors.

22           JURORS:  Good morning.

23           THE COURT:  Welcome back.  We are ready now to proceed

24    with closing arguments.  By tradition, in civil cases the

25    defendant argues first, after which the plaintiff will give her

 1    closing argument.  After that we'll have a short break and then

 2    I will instruct you on the law.

 3            So with that, I will invite Mr. Hampton to make

 4    closing argument for the defendant.

 5            MR. HAMPTON:  Thank you, Your Honor.

 6            Good morning, ladies and gentlemen.

 7            JURORS:  Good morning.

 8            MR. HAMPTON:  At the beginning of this trial,

 9    Ms. Eldredge explained that this case was straightforward, and

10    it is.  Maria Fournier was fired for unprofessional behavior

11    and poor work performance, period, end of story.

12            But purely for the sake of argument let's start with a

13    different scenario, a case that is not like this one.  In that

14    case, a manager runs a well-functioning department.  It does

15    what it's supposed to do.  She supports her employees.  She is

16    kind and trustworthy and takes responsibility for her successes

17    and failures.

18            One day she reports that she's been discriminated

19    against because she is a woman of color.  Suddenly, even though

20    everyone was happy with her work the day before, she is fired.

21    It doesn't make any sense.  There's nothing to explain it but

22    for the fact that she made that complaint.  But that's not this

23    case.  That would be a case of retaliation.  This is not a case

24    of retaliation.

25            It is different in every way.  In this case, a

1   department that was bad when the manager started is arguably

2   worse three years later.  No one is happy with the services.

3   The people above her have been encouraging and patient but

4   things aren't getting better.  Her higher-ups hint, they coach,

5   they nudge, they warn.  Nothing works.  Eventually an outside

6   company is brought in to help.  The company hears from the

7   people that work with her and for her and used to work for her

8   and they all say that she is the big problem.

9        The company tells her -- tells her employers what

10  they're hearing.  Particularly shocked is the person who hired

11  her and supported her all this time.  He realizes he's been

12  duped.  He said she had fixed the finances and she hadn't.  She

13  said she fixed the policies.  She didn't.  But most alarming of

14  all, the company informs them that people are leaving.  People

15  have already left.  If they don't act soon, they're going to

16  lose everyone.

17       Is she fired on the spot?  No.  The company has

18  policies and they need to be followed.  She sees an opening

19  there to drag out the process and hope that she can outlast the

20  boss.  So the strategy becomes delay, delay, delay and cry foul

21  at every turn.

22       Now, let's go back and walk through the timeline in

23  this case.  Maria Fournier became director in 2013.  In 2015

24  she got her first performance evaluation from Harry Spence.  He

25  pointed out some good things and he pointed out some things she

1    needed to improve on.  He noticed that she is abrupt and needed

2    to delegate better.

3         The next year Mr. Spence still had concerns about

4    Ms. Fournier as a manager.  He asked both John Laing and John

5    Bello to mentor her.  He was trying to help her succeed.

6         In her 2016 evaluation, Spence was still encouraging

7    but by this point his concerns were getting louder.  You heard

8    from Chief Justice Paula Carey.  She was responsible with Harry

9    Spence for overseeing all trial personnel of all the courts in

10   the state.  She told you during that same period of time she

11   was getting complaints from judges and clerks both that

12   interpreter services was failing and that Maria Fournier was

13   failing as its director.  She also told you how defensive Maria

14   Fournier was with her and that Ms. Fournier had been

15   belligerent to another judge.

16        By the end of 2016 it was clear to Chief Carey and

17   Harry Spence that the Trial Court needed outside help, and they

18   brought in the Ripples Group.  As you saw from the document and

19   heard from Atilla Habip and Jenna Ciotti, the Ripples

20   consultants, the plan was to have them both work with the

21   plaintiff.

22        Ms. Ciotti described for you the very indepth and

23   holistic approach that they took in analyzing interpreter

24   services, with all the court visits and interviews and staff

25   meetings.  They talked to dozens of people.  They listed the

1    folks they talked to.  You have those exhibits.  The goal of
2    those talks was to figure out why interpreter services wasn't
3    working.  What they didn't expect were the bad things they
4    learned about Maria Fournier as director.  We brought in a few
5    of those people so they could share with you what they told
6    Ripples at the time.

7         Sheriece Perry and Vanessa Dillen told you that due to
8    Ms. Fournier's mismanagement, they were not able to do their
9    job.  Let's remember their jobs are to serve the public.  They
10   exist so that people who have access to the courts can testify,
11   can get help with legal matters.  That is why interpreters are
12   so badly needed, so that anyone who speaks any language can go
13   to any court in the Commonwealth and get help; and Maria
14   Fournier was a roadblock to that service.

15        You also heard from Elaina Quinn, a deputy court
16   administrator for the Superior Court.  She doesn't work for
17   interpreter services.  She told you that Ms. Fournier is a
18   liar.  Ms. Quinn received complaint after complaint from clerks
19   about their issues with support services and with Ms. Fournier.

20        All of this feedback put Ripples Group in a tough
21   spot.  Maria Fournier was the person they'd been working with
22   on the project, a person that Harry Spence clearly liked, and
23   they were hearing the worst feedback they had encountered
24   before or since.  As you heard Atilla Habip say, they did not
25   want to write up the information they were getting about her

1    but they felt duty bound to report it.  They'd been brought in

2    to diagnose a problem and Maria Fournier herself was a big part

3    of that problem.  Not only had she not changed the system in

4    the ways that she told Harry Spence, but she personally had

5    developed such hostile relationships with people throughout the

6    court system that it was standing in the way of fixing the

7    many, many problems with her department.

8         So how do you break the bad news?  As Mr. Habip said,

9    Harry loved Maria and Ripples's job was not to make any

10   personnel decisions.  They knew that this information could be

11   very unwelcome.  We have seen the relaunch slide so many times.

12   Ms. Ciotti and Mr. Habip both told you they thought she should

13   be fired but they also told you that that was not their call to

14   make.  Ripples gave their first presentation on March 17.

15   We've seen those slides a lot, but they are worth pausing over

16   one more time because the statements are truly alarming.

17        They include statements like:  She turned into it a

18   monster.  She resorts to bullying tactics and manipulation.  It

19   was against my ethical principles to work for Maria.  She can

20   lie without blinking an eye.  This is bad stuff.  These quotes

21   amplified the problems that already existed.

22        You heard Chief Carey say that this information was,

23   quote, "sobering" and that all options were on the table for

24   Ms. Fournier.  What you never heard from any Trial Court

25   official is that they decided to keep Ms. Fournier in her

1    current position.  There's no email about it.  That was no

2    witness about it because it didn't happen.

3          During the following week, Harry Spence was on

4    vacation and Atilla Habip was out of the country.  We know that

5    Atilla Habip met with Ms. Fournier on March 27.  Before he

6    went, he emailed Chief Carey to see what the status was.  Chief

7    Carey told him that she hadn't spoken to Ms. Fournier and that

8    her sense was, quote, "she doesn't fully appreciate the

9    severity of the situation."  So that is what Mr. Habip is

10   walking into.  Things are still up in the air, a decision has

11   not been reached.  He met with her and bluntly shared the

12   feedback.

13         When Spence got back from vacation, a set of options

14   started to emerge.  Spence met with Habip midweek and Spence

15   and Chief Carey spoke about Ms. Fournier before the March 31

16   meeting.  There were a range of options, none of which involved

17   Ms. Fournier remaining as director of support services.  There

18   was demotion, retirement, transfer, termination.

19         On March 31, Spence and Fournier had their first

20   meeting to discuss which of these options it was going to be.

21   Ms. Fournier has painted the March 31 meeting with Harry Spence

22   as hostile and claims that he told her if she got an attorney,

23   all options were off the table.  But that's not what happened.

24   Just look at Ms. Fournier's own words in Exhibit 25.  She told

25   Harry that she was considering her options and she acknowledged

1    that Harry had been defending her to Chief Carey for 18 months.

2    Okay.  So we're talking about the March 31 meeting.  Let's talk

3    about the retaliation complaint.

4         Ms. Fournier told you that on March 30 she told human

5    resources that an employee had made a racist remark about John

6    Laing.  Then she told you that the next day John Laing was

7    walking out of Harry Spence's office as she was walking in, and

8    the only conclusion she could reach is that John Laing, the

9    subject of the racist remark, and Harry Spence, the person who

10   created the diversity office and hired John Laing to run it,

11   met, talked about the complaint, and then conspired against

12   Maria Fournier.  Does that make any sense?

13        John Laing told you that he had been at the Lawrence

14   District Court a month before that, didn't know about the

15   complaint on the morning that he met with Harry Spence, didn't

16   talk about it with Harry Spence, and still to this day doesn't

17   know what the actual substance of the comment about him was.

18        And you heard Harry Spence's testimony that he only

19   became aware of the complaint when he was preparing for his

20   deposition in this very case.  When Maria Fournier walked into

21   that meeting on March 31, she already knew she was in trouble

22   because Ripples had already been telling her what they'd been

23   hearing about her.  So she forwards the complaint.  And on the

24   eve of her informal hearing she says that is why she's in

25   trouble.  But someone else forwarded the complaint:  Sybil

1   Martin.  Two managers forwarded the same complaint to the same
2   department.  And Dr. Martin was not disciplined.
3        What else doesn't make sense?  The plaintiff would
4   have you believe that but for the complaint Mr. Spence was
5   going to disregard all the terrible things that Ripples had
6   reported about her.  Bullying monster, apparently totally okay.
7   But report a racist remark and you're out of here.
8        Harry Spence retired April 14 and the process
9   continued.  And you've heard a lot about the process for the
10  last two days.  It went on for months and involved multiple
11  lawyers and multiple court administrators.  The plaintiff
12  submitted several letters and hundreds of pages of exhibits.
13  You can take a look through everything she submitted.  There is
14  no defense or response in any of it to all the news about her
15  being hostile or liar or abusive to her staff.  She just blames
16  people who had worked there years before.  And you heard from
17  Eamonn Gill.  He explained that all of that blame was not
18  persuasive.  She was just demonstrating that she hadn't been
19  doing the job that she was hired to do.  That was another
20  reason to terminate her.
21        And then ultimately Jonathan Williams did terminate
22  Maria Fournier.  Attorney Flam asked why Mr. Williams did not
23  reinvestigate all of the reports in front of him.  Well,
24  Jonathan Williams did not redo all the investigations because
25  he was an effective leader who didn't micromanage his

 1    employees.  He trusted their work and took responsibility for

 2    their findings.

 3           Eamonn Gill told you that Maria Fournier could have

 4    appealed her termination but it would have gone to a committee

 5    that included all the chief judges of the various court

 6    departments as well as a clerk magistrate, people who quite

 7    likely had used interpreter services themselves and quite

 8    possibly had Maria stories of their own.

 9           It is time for this process to be over.  I will not

10    get a chance to speak to you again, but I ask that you use your

11    common sense and good judgment and look at the evidence that

12    has been presented in this case.  We thank you.  And we ask you

13    to find the Executive Office of the Trial Court did not

14    retaliate against Maria Fournier.  Thank you.

15           THE COURT:  All right.  For the plaintiff, Mr. Flam.

16           MR. FLAM:  Thank you, Your Honor.  Judge, before I

17    start I'm going to be setting up the tripod.  Where do you like

18    it?  Right here?

19           THE COURT:  Right there as long as I don't lose sight

20    with anybody.

21           MR. FLAM:  Does that work?

22           THE COURT:  We'll see when you put it on.  Just about

23    like that.

24           MR. FLAM:  Thank you.

25           Good morning, ladies and gentlemen.

1           Lies, disrespect, abuse of power.  That was the trial

2    court's approach five years ago and it's been their approach in

3    this courtroom.

4           Maria Fournier was the director of support services.

5    She was brought in, as we know, to a broken department with a

6    kindergartenlike staff who couldn't get anything done, was

7    double and triple billing taxpayers just like you, and Maria

8    put policies in place that ended that.  She cut off their gravy

9    train.

10          So were they upset?  Sure.  Sure, they were upset.

11   That's no surprise.  When you take a look at Exhibits 2 and 3

12   in your binders when you get back to the jury room, you'll see

13   those performance evaluations.  You'll see that Harry Spence

14   noted that Maria led with courage and that her changes were met

15   with -- and here's the quote they can't hide from it --

16   widespread dissatisfaction.  People were bitter and they were

17   angry.

18          So what happened next?  Paula Carey reviewed those.

19   She reviewed those performance reviews.  She didn't change a

20   word of them.  She told you that on the stand.  Everything was

21   fine.  The changes to this department that had been

22   dysfunctional for decades before she got there, she was

23   starting to make it better.  Let's not forget that Maria

24   Fournier was born and grew up in a small village in Greece and

25   came here and learned English.  Interpreter services isn't

1    something that's foreign to her.  It was something personal for

2    her.  She wanted -- she told you on that stand.  She wanted to

3    make sure it worked because she knew what it was like.

4         We heard a lot of testimony from a lot of other

5    witnesses and we're going to go through each one of them, but

6    the most important thing to remember as we go through this case

7    is what my colleague Phil Gordon told you during the opening

8    statement:  On March 17 we had a presentation, and on March 31,

9    Harry Spence called her into his office and said, I'm taking

10   you out.  This whole case is about what happened between the

11   17th and the 31st, and we promised you that they would not be

12   able to demonstrate anything in that window of time that

13   happened which could have caused a change, a shock that they

14   claim happened.  In fact, even John Williams, the court

15   administrator, came in here, the one that signed that

16   termination letter, and you saw him admit on the stand that

17   nothing happened, except Maria's complaint, nothing.

18        At the start of this case with John Laing -- John

19   Laing was that chief diversity officer.  Did you see him on the

20   stand?  His hands were a little shaky.  Did you notice that

21   everyone has referred to Harry Spence as Harry Spence, except

22   for John Laing.  He called him Court Administrator Spence.  The

23   man has been broken by his experiences at the Trial Court.  He

24   is the chief diversity officer and even he can't walk into a

25   building without having racial comments made.  This place is

1   that broken.  You'll also notice that he remembered nothing,

2   except the agenda he used for a meeting five years ago in

3   March.  That's not really believable, is it?

4        They brought in Beth Day next, the lawyer who had to

5   admit that she advised Harry Spence.  She advised John Bellow.

6   She made John Bello's decision for him.  This is the trial

7   courts.  Each one of their witnesses was asked, isn't it

8   important that the trial courts, of all places, follow their

9   own rules.  They all agreed.  And what we saw over the last two

10  weeks was time and time and time again the disrespect, the

11  abuse of power, complete disregard for any rules.

12       They brought in, as Mr. Hampton mentioned, three

13  people to talk about those anonymous quotes.  Before we discuss

14  what they testified to, let's ask ourselves a question.  Why

15  were those three women brought into court?  Every single

16  witness, including Atilla Habip, who we'll get to, admitted

17  that Harry Spence was never told the identity of any of those

18  people.  This case is about what Harry Spence decided, the

19  retaliatory motive, the retaliation in his heart.  Why are we

20  presenting evidence that Harry Spence didn't have at the time

21  he made his decision?  It's a show of force.  They are the

22  trial courts and they just brought in person after person to

23  misdirect your attention from the truth, another example of

24  them breaking the rules, of violating that fairness that they

25  all agreed they were supposed to be providing to employees like

1   Maria.

2        Vanessa Dillen, she joyfully claimed quotes on page 5,

3   oh, and the one on 28, that's mine too.  Oh, I said that too.

4   Remember?  Then I asked her, weren't you passed over for that

5   promotion she gave Sheriece Perry?  And she said yes.  And then

6   she vanished from the screen.  Right?  Gone, like a cloud of

7   dust.  That's why she left the Trial Court, because she got

8   passed over, because Maria is the only person here who actually

9   cared about people's merit and promoting people based on what

10  they brought to the table.

11       The next person they brought in was Elaina Quinn.

12  Elaina Quinn was a prosecutor, so she's got a lot of experience

13  in the courtroom and you saw her sit up proudly into the

14  microphone and loudly say "she's a liar."  Remember that?  She

15  was really happy.  But we ask ourselves who is the liar?  She

16  testified that she wasn't allowed to talk to Maria's staff,

17  that Maria stood in her way, but I showed her an email that she

18  wrote to Dr. Sybil Martin.  That's one of Maria's staff

19  members.

20       Confronted with that, she stammered and hemmed and

21  hawed and eventually admitted that she met the woman at

22  Starbucks for coffee.  She was so upset that -- I hope you saw

23  it when she got off the stand -- she took that email and threw

24  it on my table because I impeached her.  The word "impeach" is

25  where you use a document to show that someone was not telling

the truth on the stand, and that woman was not happy to be
impeached at all.  Couldn't have gotten out of here quick
enough.

Then we heard Sheriece Perry.  It's clear that
Ms. Perry is dedicated to the work of OCIS, no dispute there.
It's clear she was not happy at first because she had to do
things like compile receipts, she didn't get a company phone.
But public service is not always glamourous.  The work of
support services is not business travel and first class
airplanes and brand-new iPhones.  It's going into the
courthouses where the people who are in the most need get the
services.  It's getting the job done.  What we expect of our
Trial Court is behind the scenes.  Right?

It's really, really interesting what we've learned in
these last two weeks, isn't it?  We show up in court and we do
our thing.  But what you don't think about is everything that
goes on behind the scenes.  6,300 people are needed to make our
court system run, and they've all got to roll up their sleeves
and get the job done, because you heard Atilla Habip.  He had
to admit that Maria didn't get the support she needed.  Jenna
Ciotti told you that she should have had four managers under
her, not two.  Everyone had to do the best with what they had,
and that's what Maria did.

So why did they bring in Ms. Quinn, Ms. Dillen and
Sheriece Perry?  Misdirection.  Because Harry Spence didn't

1    know that they had those quotes.  But it's really important

2    that they brought them in because here's what we know:  All

3    those quotes were from three people whose problems really

4    weren't that big.

5         Then they brought in Chief Justice Paula Carey.  Do

6    you remember my colleague Phil told you during the opening

7    they're going to bring in witness after witness after witness,

8    maybe even a chief judge.  They did.  It's another show of

9    force.  How do we know that?  Because the first thing she

10   testified to on direct exam that was even relevant was:  I had

11   no involvement in Maria's termination.  Why was she here?

12   Because they're the trial courts and they can get a judge here.

13   I asked Mr. Williams, Tell me about your conversation with

14   Judge Sanchez, the one who wrote a letter, the one who said

15   that Maria caused seamless operation of interpreters in four

16   different courthouses.  His response:  I can't tell you about

17   that conversation because I never had it.  Nobody actually

18   spoke with the people that were involved, the folks that the

19   trial courts have brought into this courtroom.  Misdirection.

20   Don't be fooled.

21        John Bello is the first relevant witness that came in.

22   And we know, you heard Maria testify that she stood up.  It was

23   no secret.  Harry Spence admitted it.  Paula Carey admitted it.

24   Everyone admitted that discrimination was a big problem at the

25   trial courts.  Paula Carey said, well, it's a big problem in

1    society.  Our courts need to be better.  Our courts are where

2    we come to get a fair shot, color blind.  It doesn't matter if

3    you're rich or poor.  You get a fair shot in a courthouse of

4    all places.  It's the only place we should be able as a society

5    to get a fair shot.  That's what Maria stood up for because it

6    was finally happening in her department where she could do

7    something about it.

8            And John Bello, he had a moment of clarity on that

9    stand.  His conscience got the better of him.  I asked him a

10   simple question.  That hearing that you presided over, that was

11   the place where she had the ability to defend herself.  Why

12   didn't you give her the information?  You were asked multiple

13   times before that hearing, during the hearing, after the

14   hearing, mitigating factors, relaunch was the intention.  Why

15   not tell her that so she could use that?  His answer:  I don't

16   know.  And I asked him straight, you didn't give her a fair

17   hearing.  That would have been made it fair, and he agreed with

18   me.  He came clean.

19           Unfortunately, he came clean five years later, because

20   back in 2017 what happened next was Elizabeth Day wrote a

21   letter for him.  He says he read it, but you saw him flipping

22   through.  John Bello, John Williams.  This is how they reviewed

23   the documents that decided whether or not Maria Fournier's

24   career was over.  That's how much attention they put into it.

25   That's how much they respected the positions of trust they

1    were -- court administrator, highest ranking person in all the

2    state trial courts.  They owed her more.  They owed us more,

3    because everyone testified that they've got to follow the rules

4    not just because they're rules but because the public has to be

5    able to trust its courts and the folks who lead them.  We have

6    to know when we come in here and our families come in here that

7    they're going to get a fair shot.

8          So what happened next?  Beth Day wrote it for him and

9    it went to Eamonn Gill.  He talked a lot about those policies,

10   right?  He's an expert on those policies, but on cross-

11   examination he admitted that all he did was check boxes.  Do

12   you remember he said that?  Checked off the boxes just to make

13   sure that if they got sued, they had enough paper.  He admitted

14   that he was their lawyer at first and he was creating his own

15   exhibits so he could defend the case because he knew it was

16   coming.

17         And John Williams.  John Williams started by calling

18   the widespread discrimination an unfortunate problem.  Really?

19   Two hours he did this.  Hundreds of pages.  He didn't read a

20   darn thing.  He admitted it.

21         But he also had a moment of honesty up there.  I asked

22   him, What does "relaunch" mean?  What did that mean?  And he

23   told us.  Relaunch is to move forward to a new chapter without

24   a change in management.  No one was ever going to fire Maria

25   Fournier.  March 17 was that presentation.  March 27, Atilla

 1   Habip met with her.  He checked in with Paula Carey and he told

 2   her, I'm meeting with her.  And he said the conclusion -- you

 3   can see it in Exhibit 27 -- conclusion, it went from a

 4   recommendation to a conclusion.  Conclusion is we're going to

 5   relaunch you and the department.  And she agreed.  You heard

 6   her on the stand.  She testified, I'm not perfect.  But she

 7   gave it all she had, and they knew that.  On the 28th nothing

 8   happened.  On the 29th nothing happened.  The 30th she filed a

 9   complaint to Mark Conlon and on the 31st he's taking her out.

10        We saw a gentleman named Atilla Habip come to this

11   courtroom and Atilla testified that on the 29th, conveniently

12   the day before Maria's complaint, he met with Harry Spence and

13   Harry Spence told him that Maria had rejected a demotion to a

14   legal job and he was going to fire her.  But that conversation

15   didn't happen until March 31.  He made it up, made it up.  And

16   I showed him John Bello's letter which says the meeting took

17   place on Friday, March 31, and what did he say?  He's wrong.

18   He started getting snippy, right?  You saw that.

19        And then I showed him an email, the email that he

20   wrote in the evening of March 31st where he conveniently spoke

21   with a scheduler.  Remember?  Her name was Melissa Anderson and

22   she was one of the kindergarteners that he was talking about in

23   his presentation.  And after all the work that he and Jenna

24   Ciotti did, 40 interviews, 50 pages of PowerPoint slides -- you

25   have them -- all the graphs and bar charts and thoughts about

1    the future, one kindergartener says people are upset and

2    everything goes out the window.  The sky is falling.  Not

3    believable.

4         And I hope you noticed what happened on

5    cross-examination when Atilla Habip was confronted with that

6    thought.  He realized that he was caught lying on that stand.

7    And he had nowhere to hide.  So he lashed out, barked.  Did

8    everyone see that?  He barked at this courtroom.  More

9    disrespect from the trial courts and their agents.

10        The trial courts have made much ado about what's

11   called Exhibit 25.  When you get back into the jury room, I

12   want you to take a look at it.  Exhibit 25 is an email where

13   Maria apologizes to Harry Spence.  She testified about it.  She

14   was trying to save her job.  And she confirms that Harry told

15   her, I've been defending you to Paula Carey for 18 months, and

16   they think that helps their case.  It sinks their battleship.

17   And here's why:  Because nothing that Ripples said was a

18   surprise.  None of it was a surprise.  People were upset.

19   Judges were upset.  Because the interpreters weren't following

20   the rules.

21        How do we know that?  How do we know that?  Because

22   Paula Carey testified about a letter that she wrote to the

23   Department of Justice.  That's that federal agency that was

24   investigating the trial courts.  And that letter -- it's in

25   your books, Exhibit 102, that package that Eamonn Gill had, the

1   one that Jonathan Williams went like this through for two hours

2   at home one night.  Find the letter.  You'll notice something.

3        Paula Carey writes to the federal government, I'm

4   responding to the letter you sent to Harry Spence about an

5   investigation.  And then she goes on to say that the biggest

6   problem is the actual interpreters.  Sometimes hearings go over

7   and they can't move from courthouse to courthouse.  Sometimes

8   they won't show up if they can't get paid extra.  You'll see

9   it.  But the really important thing is what does she use to

10  support her letter, her defense of the trial courts?  Maria

11  Fournier.  She uses Maria's affidavit.  She uses Maria.

12       When the trial courts were in trouble and the federal

13  government was coming down on them, it was Maria that they

14  leaned on.  Everything was great.  There were problems, sure.

15  But no one was going to fire her.  It's not even a debate.  In

16  fact, they were celebrating her.  They were relying on her to

17  save their bacon.  And you've got it.  Find that letter.  It's

18  in Exhibit 102.  You'll see exactly what I'm talking about.

19       Just like Atilla Habip's story changed after Harry

20  Spence said, I'm taking you out, the trial court's whole story

21  changed.  And when they changed their reasoning, when their

22  explanations are not believable, when the day after Maria

23  Fournier files a complaint, they go from relaunching her to

24  taking her out, that's retaliation.  That's what retaliation

25  is, is they came after her because she engaged in what's called

1    protected activity.

2            She met with Mark Conlon, everyone agrees about that,

3    that director of human resources that we didn't meet.  And she

4    told Mr. Conlon that the nasty racist comment had been made,

5    blacks shouldn't be a manager, which is absurd, by the way.

6    And then she told him this was a symptom of the disease, a

7    symptom of the disease, and that it happened in her department

8    and she wants to stand up and do something about it.  And she

9    testified that Mark Conlon said, Let's circle back.  Let me

10   figure out what to do with this.  It was that important.  And

11   they did meet again on March 30 and Mark Conlon did tell her

12   that he notified John Laing.  Laing told you so.  He couldn't

13   remember the comment but the guy couldn't remember anything.

14           Conlon also said, I told Harry Spence.  Maria told you

15   that.  You didn't see Mark Conlon come in here and deny that,

16   did you?  No.  Because it happened.  Harry Spence knew and

17   that's why he changed his mind from relaunch to taking you out.

18           Why did Atilla Habip invent a March 29 meeting?  Well,

19   he had 32 million reasons to do that, didn't he?  32 million

20   dollars that guy has made working for the Commonwealth of

21   Massachusetts, 32 million dollars.  You really think he's not

22   going to show up and try and help them out?  He did.

23   Unfortunately, he got caught.  The trial courts got caught.

24   They make much ado about the fact that Maria didn't do this

25   internal hearing.  Let's unpack that for a minute, shall we?

1          John Bello admitted that he didn't give her a fair

2     hearing.  They gave her no information.  And Eamonn Gill --

3     remember the yellow bow tie, that guy, he said, I'm the expert

4     on this policy and she had the right to this hearing and she

5     would have gotten to me with all these judges.  And don't

6     worry, the court administrator is a non-voting member.  Right?

7     It sounds really attractive, doesn't it?  Except what he had to

8     admit on cross-examination, which is where you saw the truth

9     really come out in this trial, was that she only got 30

10    minutes.  How long was this trial?  Two weeks.  They were

11    giving her 30 minutes.  By the way, no new evidence would be

12    allowed.  There was no evidence in the first place.  They

13    wouldn't give it to us.  Think about that.  That's why Maria is

14    in this federal courtroom in front of you, ladies and

15    gentlemen, because she wants a fair shot, fair.  And she wasn't

16    getting that at the trial courts.

17         So there is no dispute that she engaged in what's

18    called protected activity.  She made that complaint to Mark

19    Conlon about the widespread discrimination and about the

20    comment itself.  There's no dispute that she suffered an

21    adverse action.  24 hours later, the next day, I'm taking you

22    out.  And that's what happened.  They would have you believe

23    that she wasn't technically fired until August.  Well, let's

24    examine what actually happened.

25         Harry Spence said, I'm taking you out.  Then he writes

1    a letter on April 10.  He says I'm having a hearing, the next

2    day, tomorrow and I'm going to be your judge and jury and

3    executioner.  Her lawyer got that hearing moved.  So they put

4    her on administrative leave.  They took her nameplate off.

5    They changed the locks to her office.  They told her she wasn't

6    allowed to talk to anyone and they told everyone they weren't

7    allowed to talk to Maria.  John Williams had to admit that

8    there was no way she was ever coming back.  We all know that to

9    be true.  The second Harry Spence made his decision, it was

10   done.

11        So then we get to that causal link is what we have to

12   prove here today.  Why?  Why did this happen?  And the answer

13   is clear.  My colleague Phil told you during the opening you

14   were going to be confronted with a man who was more concerned

15   about his legacy than administering the courts.  You heard the

16   testimony.  He created the position of diversity chief for John

17   Laing.  He did.  And that's what he wanted his legacy to be.

18   Remember, the Department of Justice, the federal government had

19   come down on them and investigated them.  The interpreters

20   filed a lawsuit.  There were allegations that, as he testified,

21   an employee named Girardi used the N word.

22        That same employee said -- and this is from his

23   testimony -- that Hispanic employees were being hired to take

24   away our jobs.  So Mr. Spence was asked in his deposition --

25   you heard it read -- so now we have Girardi using the N word

1    and outwardly agreeing with anti-Hispanic words.  Are you

2    starting to see a pattern, sir?  His response, Yeah, if the

3    question is is there evidence that Giardi engaged in really

4    seriously and racially offensive behavior after she was

5    appointed, the answer is yes.  Is that really his answer?  He's

6    a court administrator.  No steps were taken to discipline that

7    woman.  Spence said she had already been promoted and I had two

8    weeks only left on the job.

9         Then he was asked during those last two weeks you took

10   action to remove Ms. Fournier.  His answer, She reported to me.

11   That was my responsibility.  He admitted he knew he had two

12   weeks left and he wasn't going to let the story be widespread

13   discrimination at the trial courts as Harry Spence goes off

14   into retirement.  No.  He was going to take her out, just like

15   he said.  The racist gets to stay and Maria's life is ruined.

16   That's the end result.  And that's what this jury has the power

17   to correct.

18        Ladies and gentlemen, Maria told you how hard she's

19   worked to find a job since then.  Kerry Skillin, our expert

20   witness, came in and told you that it's not about quantity --

21   you just don't apply first and ask questions later.  It's about

22   the quality of your job search, how hard she's worked and how

23   impressed Ms. Skillin was.  They brought in an expert,

24   Dr. Charles Sodikoff.  I'm not sure if you were floored but he

25   admitted that the nature of the termination made it so that

1    Maria will never likely be able to work in state government

2    again.  Her career is over as she knew it.  She's got to change

3    careers if she ever wants to work again.  That's what they did.

4         So I want to walk you through what happens when you

5    get back to that jury room and end your deliberations because

6    you're going to have a jury verdict sheet, and it's going to

7    ask you some questions.

8         Question 1, has the plaintiff, Maria Fournier, proven

9    by a preponderance of the evidence -- that's 51 to 49, more

10   likely than not.  Judge Gorton will advise you on the law --

11   has she proven 51 to 49 that the defendant retaliated against

12   her?  The answer is yes.

13        Question 2, has Maria Fournier proved -- again, 51 to

14   49, a little more likely than not -- that the defendant

15   retaliated against her in violation of the state law?  The

16   answer is to check yes.

17        And then you'll have to turn the page and you'll have

18   to fill in the numbers that Dr. Craig Moore gave you.  You'll

19   notice that they did not dispute his numbers.  Those are the

20   numbers.  There is no dispute in this courtroom.  And you might

21   recall that he testified about these slides.

22        Your Honor, is this placement okay?

23        THE COURT:  That's fine.

24        MR. FLAM:  Thank you.

25        Table one is back pay.  Back pay is today back to the

1    day they fired her.  This is what it takes to make her whole,

2    the present value number.  And that number to fill in, ladies

3    and gentlemen, is $774,120.  Put that on the line, make her

4    whole from today backwards.

5         The second slide, ladies and gentlemen, is what's

6    called front pay.  Now, remember, Maria worked in the state

7    system for 22 and a half years and even their own expert admits

8    she's not likely to ever be able to return.  This front pay

9    number takes her from today to the date she was supposed to be

10   able to retire.  That number is $753,092.

11        And the third slide, ladies and gentlemen, so you can

12   see just what a devastating impact this has had financially on

13   Maria, this is the value of her pension that she's not going to

14   get.  Now, she's got a partial pension.  But she's short

15   $1,741,011 because of what they did to her and we need you to

16   make her whole.  So on the first line I want you to write

17   $774,000 and on the second line you'll see that the form asks

18   you to combine that front pay and the pension.  And that number

19   is 2.49 million dollars.  That's financially how bad they hurt

20   her.

21        THE COURT:  You need to wrap up, Mr. Flam.

22        MR. FLAM:  This isn't just about money.  Remember what

23   it was like to watch Maria for two weeks relive everything and

24   imagine how hard it was for her to live through it five years

25   ago and for the five years since and fill in the emotional

1    distress damage that you think is fair.  Use your common sense.

2    Use your good judgment.

3           And then turn that page.  The question on punitive

4    damages, answer yes.  Let this world know that what they did is

5    not okay, that it breaks the rules of society and they can't do

6    this to anyone else ever again.

7           Ladies and gentlemen, thank you.

8           I have nothing further, Your Honor.

9           THE COURT:  All right.  Jurors, we're going to take a

10   short break before my charge to you on the law.  It will be a

11   ten-minute break and we'll be back.

12          THE CLERK:  All rise for the jury.

13          THE COURT:  We are in recess for ten minutes.

14   (Court and Jury exit.)

15   (A recess was taken.)

16          THE CLERK:  All rise for the jury.

17   (Court and Jury enter.)

18          THE CLERK:  Thank you.  You may be seated.

19          THE COURT:  Good morning again, jurors.

20          You have now heard the evidence and the closing

21   arguments in this case.  It is now my duty to instruct you on

22   the law that you must follow and apply.  In any jury trial

23   there are, in effect, two judges.  I am one of the judges and

24   you, collectively, are the other.  It is my duty to preside

25   over the trial and to determine what testimony and evidence is

1    relevant under the law for your consideration.  It is also my

2    duty at the end of the trial to instruct you on the law

3    applicable in this case.  You, as jurors, are the judges of the

4    facts.  But in determining what actually happened in this case,

5    that is, in reaching your decision on the facts, it is your

6    sworn duty to follow the law as I am about to define it for

7    you.  And when I'm finished, you will begin your discussions

8    with one another, which is what we call jury deliberations.

9         Now, to help you understand and remember these

10   instructions on the law, I will divide them into three parts:

11   First, general instructions intended to guide you throughout

12   your deliberations; second, instructions about the claims and

13   about the questions that I will ask you to answer as stated in

14   it a verdict form, and about the law you must apply in

15   considering these questions; and third, some additional general

16   instructions about the procedures that you are to follow during

17   your deliberations.

18        These instructions are somewhat complicated, and I ask

19   you to pay very careful attention.  I need to read them to you

20   because I cannot commit to memory all of the law about which I

21   will instruct you, but I will submit to you a written copy of

22   this charge when you go to the jury room.  I want to caution

23   you right away, however, not to dwell on any one particular

24   portion of it, if you decide to review it at all, because you

25   must consider these instructions as a whole and not just one

```
 1   individual particular instruction.  So I ask you to do the best
 2   you can to stay with me.
 3        All of my instructions are about the law you must
 4   apply.  I do not mean any of these instructions to be
 5   understood by you as comments by me on the facts or on the
 6   evidence in this case.  It is your function to determine the
 7   facts.  Although the law allows a trial judge in this session
 8   to comment on the evidence, I deliberately do not do so and
 9   instead leave the fact-finding entirely in your hands.  You are
10   the sole and exclusive judges of the facts.
11        Fortunately, you do not need to resolve every dispute
12   of fact raised by evidence.  In order to know which fact
13   disputes are important, you need to know what rules of law to
14   apply.  I have explained some of those rules during the course
15   of this trial and I will explain others to you now.  The
16   lawyers were allowed to comment during their arguments on some
17   of these rules of law, but if what they have said about the law
18   differs in any way from my instructions, you must be guided
19   only by the instructions on the law as I state them.
20        You must follow all of the rules as I explain them to
21   you.  A single sentence or statement might not refer to an
22   exception or qualification that I have stated elsewhere in
23   these instructions.  So you must consider them all together as
24   a unit.
25        Even if you disagree with one or more of the rules of
```

 1   law or don't understand the reasons for them, you are bound to

 2   follow them.  This is a fundamental part of our system of

 3   government by law rather than by the individual views of a

 4   judge or jurors who have the responsibility for deciding a

 5   case.  If I make a mistake on instructing you about the law,

 6   fair and even-handed application of the law to this and other

 7   cases is nevertheless assured, because any mistake I make on

 8   the law can be corrected on appeal.  In contrast, your decision

 9   on disputed facts is final.  That is, your findings on material

10   disputed facts are not subject to appeal.  You are the final

11   and exclusive judges of the facts.

12          And in your fact-finding, you are not to be swayed by

13   bias, prejudice, sympathy or antagonism.  It is your function

14   to find the facts fairly and impartially on the basis of the

15   evidence.

16          And the evidence in this case consists of all the

17   exhibits received into evidence, all the facts that may have

18   been admitted or stipulated to, and all of the sworn testimony

19   of the witnesses.

20          As I told you at the beginning of the trial,

21   statements, arguments, and objections to questions by lawyers

22   are not evidence.  This includes opening statements in which

23   counsel tell you what the parties expect the evidence will

24   show.  Any evidence ordered stricken by the court must also be

25   disregarded.  Anything you may have seen or heard outside of

1    this courtroom is not evidence and you must disregard it

2    entirely.  Your verdict must be based solely on the evidence

3    presented in this courtroom and in accordance with my

4    instructions.  If any reference by the court or by the lawyers

5    to matters of evidence is different from the way you remember

6    the evidence, let your collective memory control.

7            Also, from the facts proved, you may draw reasonable

8    inferences about additional facts.  An inference is a deduction

9    or a conclusion.  An inference is an additional finding that

10   your experience, reason and common sense leads you to draw from

11   the facts that you find are proved by the evidence.  Any

12   inference that you draw from the facts proved must be a

13   reasonable one and not merely conjecture or guesswork.  You

14   might decide that you do not have a sufficient basis to decide

15   what inference to draw.  It is for you as judges of the facts

16   to decide whether the evidence before you is or is not

17   sufficient for you to draw an inference.  Ultimately, in

18   drawing inferences, you should use your common sense.

19           Now, the evidence in this case includes facts to which

20   the lawyers have agreed or stipulated.  A stipulation means

21   simply that the government, or rather that the defendant and

22   the plaintiff accept the truth of the particular proposition or

23   fact and you, likewise, should accept it as true, because there

24   is no disagreement, there is no need for evidence of that fact

25   apart from the stipulation.  As with all evidence, however, you

1     should give the stipulation whatever weight you believe it

2     deserves.

3          During this trial, certain testimony has been

4     presented by way of deposition.  You heard portions of the

5     transcript of a deposition read to you.  A deposition consists

6     of sworn recorded answers to questions asked of witnesses in

7     advance of the trial by attorneys for the parties in the case.

8     Such testimony is entitled to the same consideration and is to

9     be weighed, judged as to credibility and otherwise considered

10    by you insofar as possible in the same way as if the witness

11    had been present and had testified from the witness stand.

12         Now, during the trial you've also heard testimony from

13    individuals who have specialized skill or knowledge.  Such a

14    witness is sometimes referred to as an "expert witness."

15         The law allows a person having specialized skill or

16    knowledge to state an opinion about matters in that person's

17    particular field.  The mere fact that the witness is allowed to

18    testify as one having specialized knowledge or experience does

19    not mean, however, that you must accept that opinion.  It is

20    for you to decide whether the opinions expressed were mere

21    speculations or guesses or were instead based on sound reasons,

22    judgment and facts.  You should not substitute the expert's

23    testimony for your own reasonable judgment and common sense.

24    The credibility of each witness is for you to determine.

25         If you find that part or all of the expert's opinion

1   testimony was based on stated or unstated assumptions, and you

2   further find that those assumptions are contrary to your

3   factual findings, then you will disregard any part of the

4   opinion testimony that was based on assumptions contrary to

5   your factual findings.

6        Also, your decision whether or not to rely upon

7   opinion testimony by an expert witness will depend upon your

8   judgment about whether the witness's education, training and

9   experience is sufficient for him or her to give the opinion

10  that you heard.  Additionally, in weighing the testimony, you

11  should consider factors that bear upon the credibility of the

12  expert witness such as the fact that the witness was retained

13  by one of the parties in the case, the soundness of the reasons

14  given for the opinion and all other evidence in the case.

15       It is up to you, bearing all of these considerations

16  in mind, to decide whether you believe and choose to rely on

17  the testimony of a witness having specialized skill or

18  knowledge.  You may accept all of it, part of it, or none of it

19  as you find appropriate.

20       Now, two phrases often used in discussions about

21  evidence received at a trial are "direct evidence" and

22  "circumstantial evidence."

23       Testimony of a witness showing firsthand observation

24  of a fact by that witness is direct evidence.  For example, the

25  testimony of an eyewitness just about what he or she saw is

1    direct evidence.  If the witness is permitted to go beyond what

2    he or she saw and is permitted to state a conclusion or an

3    inference or an opinion, that part of the answer is not direct

4    evidence.  Instead, it's a certain kind of circumstantial

5    evidence.

6            Circumstantial evidence is proof of some facts,

7    including events and circumstances, on the basis of which the

8    jury may infer the existence or nonexistence of additional

9    facts.  For example, let's suppose you have been in this

10   courtroom for a few hours and unable to look outside.  A man

11   comes into the back of the courtroom wearing a wet raincoat and

12   carrying a dripping umbrella.  You may infer from that

13   circumstance that it is raining outside.  That is what we call

14   circumstantial evidence as opposed to the direct evidence,

15   which would be the testimony of the man in the wet raincoat

16   taking the witness stand and telling you that it's raining

17   outside.

18           Direct and circumstantial evidence have equal standing

19   in the law.  That is, with respect to what weight shall be

20   given to evidence before you, the law makes no distinction

21   between direct and circumstantial evidence.  No greater degree

22   of certainty is required of circumstantial evidence than direct

23   evidence.  You are to consider all of the evidence in the case

24   and give each item of evidence the weight you believe it

25   deserves.

1          Now, at times during the trial you heard lawyers

2    object to questions asked by the other lawyer and to answers by

3    witnesses.  It is a proper function for lawyers to object.  In

4    objecting, a lawyer is requesting that I make a decision on a

5    question of law.  Do not draw from such objections or from my

6    rulings on them any inferences about facts.  The objections and

7    my rulings related only to legal questions that I had to

8    determine.  They should not influence your thinking about the

9    facts.

10          When I sustained an objection to a question, the

11   witness was not allowed to answer.  Do not attempt to guess

12   what the answer might have been.  And if you heard an answer to

13   a question before my ruling, you are to disregard it.  In your

14   deliberations, do not consider or talk about any question to

15   which I sustained an objection or any answer or any other

16   statement that I excluded or struck or told you not to

17   consider.

18          During the course of the trial I may have made

19   comments to the lawyers or spoken to a witness concerning the

20   manner of his or her testifying.  Do not assume from anything

21   that I may have said that I have any opinion concerning any of

22   the issues in this case.  Except for my instructions to you on

23   the law, you should disregard anything I may have said during

24   the trial in arriving at your own findings as to the facts.

25          At the beginning of the trial, I instructed you about

1    taking notes.  I remind you that notes taken by any juror are

2    not evidence in this case and must not take precedence over

3    your independent recollection of the evidence received in the

4    case.  Notes are only an aid to recollection and are not

5    entitled to any greater weight than actual recollection or the

6    impression of each juror as to what the evidence actually is.

7           An important part of your job as jurors will be

8    deciding whether or to what extent you believe what each

9    witness had to say and how important that testimony was.  You

10   are the sole judges of the credibility of each witness.  In

11   deciding whether to believe a witness or how much weight to

12   give to that witness's testimony, you may consider anything

13   that reasonably helps you to assess that testimony.

14          The following are the kinds of questions you may want

15   to consider in evaluating a witness's credibility.  Did the

16   person seem honest?  Did he or she have some reason not to tell

17   the truth?  Did the witness have an interest in the outcome of

18   the case?  Did he or she gain any personal advantage by

19   testifying in the case?  Did the witness seem to have a good

20   memory?  Did the witness's testimony differ from his or her

21   earlier testimony or from the testimony of other witnesses?

22   Was the witness's testimony different on cross-examination than

23   on direct examination?  What was the witness's manner while

24   testifying?

25          These are some, but, of course, not all, of the kinds

1    of things that will help you decide how much weight to give to

2    what each witness had to say.  You may also consider any

3    demonstrated bias, prejudice or hostility of a witness in

4    deciding what weight to give to the testimony of that witness.

5           The mere number of witnesses or exhibits or the length

6    of the time has no bearing on the weight you are to give to

7    evidence or on whether you find that the burden of proof has

8    been met.  Weight does not mean amount of evidence.  Weight

9    means your judgment about the credibility and importance of

10   evidence.

11          You may consider inconsistencies or differences as you

12   weigh evidence, but you do not need to discredit testimony

13   merely because an inconsistency or difference exists.  Two or

14   more witnesses may see or hear things differently.  Innocent

15   misrecollection, like failure of recollection, is a common

16   experience.  In weighing the effect of any inconsistency or

17   difference, consider whether it concerns a matter of importance

18   or an unimportant detail, and whether it results from innocent

19   error or intentional falsehood.

20          On the other hand you are not required to accept

21   testimony merely because it is not -- merely because it is

22   uncontradicted.  You may decide, because of the witness's

23   bearing and demeanor, or because of the inherent improbability,

24   or for whatever reason, that testimony is not worthy of belief.

25   You may accept all of a witness's testimony or reject all of

1    it, or you may accept part and reject another part.

2         You have heard evidence that at some earlier time a

3    witness has said or done something which counsel argue is

4    inconsistent with the witness's trial testimony.  Evidence of a

5    prior inconsistent statement is not to be considered as

6    affirmative evidence in determining credibility.  Rather, it is

7    placed before you for the more limited purposes of helping you

8    decide whether, or how much, if any, of that witness's trial

9    testimony to believe.

10        In making this determination, you may consider whether

11   the witness purposely made a false statement or made an

12   innocent mistake; whether the inconsistency concerns an

13   important fact or small detail; whether the witness had an

14   explanation for the inconsistency, and if so, whether it

15   appeals to your common sense.

16        As to all of the issues in this civil case, the

17   standard of defining the burden of proof is the preponderance

18   of the evidence standard.

19        To establish something by a preponderance of the

20   evidence means to prove that it is more likely true than not

21   true.  It means that such evidence, when considered and

22   compared with the evidence opposed to it, has more convincing

23   force and produces in your mind the belief that what is sought

24   to be proved is more likely true than not true.  As I said at

25   the beginning of the trial, to put it differently, if you were

1    to put the plaintiff's and the defendant's evidence on opposite

2    sides of the scales, the plaintiff would have to make the

3    scales tip somewhat in her direction.  In determining whether

4    any fact in issue has been proved by a preponderance of the

5    evidence in this case, you may consider the testimony of all

6    witnesses, regardless of who may have called them, and all

7    exhibits received into evidence, regardless of who may have

8    introduced them.  The burden of proof has not been carried if,

9    after considering all of the evidence, you find that you must

10   speculate, guess or imagine that one or more of the necessary

11   facts is true.

12        As a reminder, the burden of proof by a preponderance

13   of the evidence standard does not, of course, require proof to

14   an absolute certainty.  Nor is proof beyond a reasonable doubt

15   or by clear and convincing evidence required.

16        In many cases there is an element of sympathy which

17   surrounds the trial.  People involved in the case may be

18   deserving of sympathy in everyday life.  The courtroom is not,

19   however, a place for sympathy.  When you decide this case, you

20   must do so on the basis of the facts as you find them,

21   disregarding sympathy and emotion.  You must consider the

22   evidence in accordance with the burden of proof as I have

23   described and the specific instructions that I will give you in

24   a few minutes.

25        Now, as to Part II of these instructions, in this

case, I will submit specific questions to you in a verdict

form.  First, I will summarize the two claims of the plaintiff

and explain how to apply the law to those claims.  In a few

moments, my deputy clerk will distribute copies of that verdict

form to you that you will have in the jury room and I will

refer to that form from time to time during the remainder of

these instructions.

The plaintiff, Maria Fournier, alleges that the

defendant, the Commonwealth of Massachusetts, specifically the

Executive Office of the Trial Court, retaliated against her in

violation of state and federal law.  She claims that she was

terminated from her position as director of support services

because she reported a racist remark made about one of her

colleagues.  The defendant denies the allegation and contends

that it terminated Ms. Fournier because of concerns about her

performance and behavior.

The plaintiff has brought claims under both federal

and state law.  While both claims relate to those same events,

they are separate claims and you should consider them

separately.  You might find that the plaintiff has proven one

claim but not the other, that she has proven both claims, or

that she has proven neither claim.

I will first instruct on the law regarding the

plaintiff's federal claim and then the law regarding the state

claim.

1            And now I'll ask my deputy to pass out the verdict

2     form.

3            All right.  You'll notice that this is on the format

4     of the case and it is entitled "Verdict Form."  And it says,

5     "Title VII Claim," and question number one reads as follows:

6     Has the plaintiff, Maria Fournier, proven, by a preponderance

7     of the evidence, that the defendant retaliated against her in

8     violation of Title VII?  And there's a place for you to check

9     that question yes or no.  I'm going to ask you to put the form

10    down and we're going to talk about that claim and then we'll

11    come back to the form again.

12           Now, Ms. Fournier alleges that the defendant

13    retaliated against her in violation of federal law, namely

14    Title VII of the Civil Rights Act of 1964.  The plaintiff must

15    prove three elements of that claim by a preponderance of the

16    evidence to prevail on her federal claim.

17           First, she must prove that she engaged in protected

18    conduct.

19           Second, she must prove that after engaging in

20    protected conduct, her employer took an adverse action against

21    her.

22           Third, she must prove that, but for her protected

23    conduct, her employer would not have taken the adverse action.

24           I'll now explain each of the three elements of the

25    plaintiff's claim in greater detail.

An employee has engaged in protected conduct if she has opposed any unlawful employment practice.  To "oppose" a practice means to resist, confront or contend against it or to be hostile, antagonistic or adverse to it.  Opposition does not require an employee to instigate or initiate a complaint, but such action might indicate opposition.

"Unlawful employment practice" means an employment practice made illegal by Title VII.  Title VII prohibits discrimination on the basis of race by any employer against any of its employees.  Ms. Fournier's claim does not require that she herself was the target of the unlawful employment practice.

Ms. Fournier need not prove that the action which she opposed actually amounted to an unlawful employment practice.  Rather, she must demonstrate only that she had a reasonable belief that the opposed conduct was an unlawful employment practice.  "Reasonable belief" has a subjective and an objective component.  First, the plaintiff herself must have actually held the belief.  And second, the belief must be objectively reasonable, which means that an ordinary person in her shoes would have thought that her belief was reasonable based on all of the facts and the circumstances.

An "adverse action" is one that would be materially adverse to a reasonable employee, that is, an action that could well dissuade a reasonable worker from making or supporting a charge of discrimination.  This is an objective standard, which

1    means that in determining whether an action is adverse you

2    should ask yourself whether a reasonable employee would have

3    thought it was adverse.  "Material" means significant, as

4    opposed to trivial.  Adverse actions may include, but are not

5    limited to, terminating, failing to promote, demoting or

6    reassigning with significantly different responsibilities.  For

7    the purpose of this claim an adverse action taken by a

8    supervisor is an adverse action of the employer.

9            The plaintiff must prove that the desire to retaliate

10   was the but-for cause of the adverse action.  "But-for cause"

11   means that the defendant would not have taken the adverse

12   action if the plaintiff had not engaged in the protected

13   activity.

14           You may decide that non-discriminatory factors were

15   involved in the defendant's decision-making process.  The

16   plaintiff does not have to prove that her protected activity

17   was the only factor that motivated the defendant to terminate

18   her.  Rather, as I have explained, the plaintiff must only

19   prove that but for her protected activity, she would not have

20   been terminated.

21           An employer is free to terminate an employee for any

22   non-discriminatory reason even if its business judgment might

23   seem to you to be objectively unwise or ill-advised.  In other

24   words, an employer may make its hiring and termination

25   decisions however it seems fit, so long as those decisions are

1  not unlawful.

2       The plaintiff is not required to produce direct

3  evidence that the defendant, that is, the Executive Office of

4  the Trial Court, had an unlawful motive when it terminated her.

5  You may infer that the defendant had an unlawful and

6  retaliatory motive from the existence of other evidence, for

7  example, explanations for her termination that you find were

8  pretextual.  A pretextual explanation is one which is false or

9  is not a real reason for the action taken.  You should consider

10  the believability of an explanation in determining whether it

11  is a pretext, that is, a cover-up for retaliation.

12       The following are some of the things that you may want

13  to ask yourself when considering whether the defendant's

14  explanation was pretextual:  Has the reason that the defendant

15  has given for the action changed over time?  Did the conduct

16  deviate from its standard practices or policies?  Is the

17  explanation implausible?  Did the adverse action occur very

18  close in time to the protected conduct?  Has the reason given

19  by the defendant been shown to be false?  Above all, however,

20  you should use your judgment and common sense in determining

21  whether the proffered explanation is genuine or a pretext for

22  retaliation.

23       You may find that the ultimate decisionmaker, that is,

24  the person who terminated Ms. Fournier, did not harbor any

25  retaliatory animus toward her.  If, however, that

1    decision-maker simply approved, assented to or gave a "rubber
2    stamp" to the recommendation or decision of another individual
3    who was motivated by his desire to retaliate against
4    Ms. Fournier for engaging in protected activity, you may still
5    find that the desire to retaliate was the but-for cause of her
6    termination.  In making that determination, you should consider
7    whether the ultimate decisionmaker acted as a rubber stamp for
8    someone else's retaliatory decision or came to his own
9    independent conclusion based on lawful considerations.
10          I will turn now to the plaintiff's claim under
11    Massachusetts state law and I'll go back to the verdict form
12    and ask you to pick it up and look at page 1, that second
13    paragraph that's entitled M.G.L. c -- that stands for Mass.
14    General Laws Chapter -- 149, Section 185 Claim.  And question 2
15    says:  Has the plaintiff, Maria Fournier, proven, by a
16    preponderance of the evidence, that the defendant retaliated
17    against her in violation of M.G.L. c. 149, Section 185, also
18    known as the Whistleblower Act.  And there's a place for you to
19    check off yes or no.  I'll ask you to put the form down one
20    more time and we'll talk about that second question.
21          Massachusetts law prohibits a governmental employer
22    from retaliating against its employee for engaging in certain
23    kinds of activity.  I instruct you that as a matter of law the
24    defendant is a governmental employer.  The plaintiff must prove
25    three elements by a preponderance of the evidence in order to

prevail upon this claim.  The first is that she engaged in protected activity while working as a government employee at the Executive Office of the Trial Court of the Commonwealth of Massachusetts.

The second is that the defendant retaliated against her because of that protected activity.

And the third is that the defendant's retaliation harmed the plaintiff.

I will now explain each of those elements in greater detail.

With respect to the first element, the plaintiff must show that, while working as an employee of the Executive Office of the Trial Court, she disclosed, objected to or refused to participate in an activity, policy or practice that she reasonably believed either violated a law, a rule or regulation promulgated pursuant to a law, or posed a risk to public health, safety or the environment.

The plaintiff does not need to prove that the conduct that she disclosed, objected to or refused to participate in actually violated a law.  Rather, she need only prove that she reasonably believed that the conduct violated a law, rule or regulation, or posed a risk to public health, safety or the environment.  For the purpose of this claim, reasonable belief is evaluated by the same standard on which I instructed you in the context of Ms. Fournier's federal claim.

1          The second element that the plaintiff must prove is

2    that the defendant retaliated against her because she engaged

3    in the protected activity.

4          Retaliation means that the defendant took some adverse

5    action against the plaintiff, such as, for instance,

6    terminating, suspending or demoting her.  The adverse action

7    must concern the plaintiff's employment.  As with plaintiff's

8    federal claim, an adverse action taken by a superior is an

9    adverse action of her employer.

10          The plaintiff must also prove that the defendant took

11   the adverse action because she engaged in the protected

12   activity.  She need not prove that it was the only reason for

13   the adverse action but she must prove that the defendant would

14   not have treated her adversely unless she engaged in the

15   protected activity.  In other words, she must prove that her

16   protected activity was the determinative, or the but-for, cause

17   of the adverse action.  Again, as with Ms. Fournier's federal

18   claim, retaliatory motive may be proven if the ultimate

19   decisionmaker served as a "rubber stamp" of someone else's

20   retaliatory decision.

21          In this case, the defendant maintains that it

22   terminated Ms. Fournier for legitimate business reasons.  When

23   considering whether her protected activity was the

24   determinative cause of her termination, you may want to ask

25   yourself the same questions about pretext on which I instructed

1   you with respect to her federal law claim.

2          The third element that the plaintiff must prove is

3   that she suffered harm because the defendant retaliated against

4   her.  In other words, she must have suffered some damage.

5   Damages may include lost wages or benefits or emotional

6   distress.

7          I will now instruct you on the question of damages.

8   The mere fact that I instruct you on damages does not mean that

9   you must find damages.  Also, the mere fact that I instruct you

10  on a particular kind of damages does not mean that you must

11  find damages of that kind.  I am required to give you a

12  complete set of instructions as to the law.  You are to award

13  damages only if you find that the plaintiff has proven her

14  claim by a preponderance of the evidence.  The burden is on the

15  plaintiff to prove damages with as much precision and accuracy

16  as the circumstances permit.  Unless I tell you otherwise, my

17  instructions with respect to damages apply to both of

18  Ms. Fournier's claims.

19          Now, we're going to go back to the verdict form.  At

20  the bottom of page 1 you'll see in bold an instruction.  It

21  says:  If you answer either Question 1 or Question 2 "Yes," you

22  are to proceed to Question 3, "Damages."  If you answer both

23  Questions 1 and 2 "No," your deliberations are complete.  In

24  other words, if you don't find any liability, you don't get to

25  page 2 and the damages.

1           But for the moment, considering if you do find "Yes"
2   as to either of the first two questions, turn over to page 2,
3   and you'll see that it is entitled "Damages."  And it says,
4   Question Number 3, What damages, if any, do you award to the
5   plaintiff for the violation or violations found in Question 1
6   and/or Question 2?  Then there are three subsections to that.
7   First refers to back pay.  The second refers to front pay,
8   including benefits and pension.  And the third lists emotional
9   distress.  And in each one you'll notice there's a place to
10  write in the number in words and then in numbers just like you
11  do on a personal check.  So there's a way to check that you're
12  right.  We have two ways to tell.
13          All right.  We'll put the form down.  We're going to
14  go back to it one more time but we're going to talk about this
15  portion of the damages part of my instructions.
16          First, you should consider economic damages.  If you
17  find for the plaintiff on one or both of her claims, you are to
18  award her an amount equal to the pay and benefits that she
19  would have received from the defendant had the discriminatory
20  action alleged not taken place, less the amount of earnings and
21  benefits received by the plaintiff from other sources after the
22  adverse employment decision.
23          You may not award duplicative damages, meaning you
24  must not overcompensate the plaintiff by awarding more than the
25  total amount of any lost wages.  The goal of damages for

1  retaliation is to compensate the plaintiff fairly and to make

2  her whole.

3      Although mathematical precision is not required in

4  assessing damages, you must not speculate or guess in awarding

5  damages.  Neither can you award damages out of sympathy for the

6  plaintiff.  The award must be based upon just and reasonable

7  inferences from the evidence and you must only award damages

8  that the plaintiff proves, by a preponderance of the evidence,

9  were suffered by her and were caused by the defendant.  If the

10  plaintiff does not prove any damages by a preponderance of the

11  evidence, you may either award no damages or award nominal

12  damages in the amount of $1.

13      If you find for the plaintiff on either of her claims,

14  you may award her back pay damages, which are her lost wages

15  from the date of her termination to the time of trial,

16  including pay and benefits that would have accumulated but for

17  her termination.  Any award of back pay must be reduced by the

18  amount of earnings and benefits received by the plaintiff from

19  any other employment from the date of her termination to the

20  time of trial.

21      If you find for the plaintiff on either of her claims,

22  you may award her front pay damages, which are intended to

23  compensate the plaintiff for the loss of future earnings and

24  benefits caused by the defendant's retaliatory conduct.  In

25  other words, front pay is the amount of future earnings,

1    including salary and benefits such as pensions, that the

2    plaintiff would have received but for the defendant's unlawful

3    discrimination.

4         In determining front pay, you may consider:  (1) the

5    amount of earnings, including salary and benefits, that the

6    plaintiff would have received between the time of trial and the

7    plaintiff's projected retirement date; (2) the plaintiff's

8    probable retirement date; (3) the amount of earnings that the

9    plaintiff would probably have received from another employer

10   until her retirement, which would reduce any front pay award;

11   (4) the availability of other employment opportunities; and (5)

12   the possibility of future wage increases and inflation.

13        If you award damages to the plaintiff for losses she

14   will suffer in the future, keep in mind that the plaintiff

15   cannot be awarded damages that overcompensate for the losses

16   that she suffered because of the defendant's conduct.

17        In order to avoid overcompensating the plaintiff, you

18   must consider that the amount of money you award the plaintiff

19   today for future losses can be put in the bank where it can

20   earn interest.  So, in making an award for future damages, you

21   must determine the amount of money that, if invested today at a

22   reasonable rate of interest, would in the future provide the

23   plaintiff with the amount of money that you calculate she will

24   lose in the future as a result of the defendant's conduct.

25        If you find for the plaintiff on either of her claims,

1    you may also award her reasonable damages for her emotional

2    distress.  Emotional distress includes mental pain, discomfort,

3    indignity, depression, fear, anxiety or humiliation suffered as

4    a result of the discrimination.

5          When considering emotional distress awards, evidence

6    in the form of some physical manifestation of the emotional

7    distress, although beneficial, is not necessary to awarding

8    damages.  An award must rest on substantial evidence and its

9    factual basis must be made clear on the record.

10         In determining the amount of damages to be awarded for

11   emotional distress, you may consider, first, the nature and

12   character of the alleged harm; second, the severity of the

13   harm; third, the length of time plaintiff has suffered and

14   reasonably expects to suffer; and, fourth, whether the

15   plaintiff has attempted to mitigate the harm, such as by

16   counseling or by taking medication.

17         In addition, the plaintiff must show a sufficient

18   causal connection between the defendant's unlawful act and the

19   plaintiff's emotional distress.

20         You are further instructed that the plaintiff has a

21   duty to mitigate her damages, that is, to make reasonable

22   efforts under the circumstances to reduce her damages.  Thus,

23   if the defendant proves, by a preponderance of the evidence,

24   that the plaintiff failed to seek out or take advantage of an

25   opportunity that was reasonably available to her, you must

1    reduce the award of the damages by the amount of wages and

2    benefits that she reasonably would have earned if she had

3    sought out or taken advantage of that opportunity.

4         The plaintiff need only make reasonable efforts to

5    mitigate her damages.  She is not, for instance, required to

6    apply to or accept a job which is not substantially equivalent

7    to her old job.  When deciding whether a job is substantially

8    equivalent to her old job at the Executive Office of the Trial

9    Court, you should consider the type and conditions of work, the

10   salary, the geographic location, and the promotion and

11   advancement opportunities.  You should also take into account

12   the extent to which any failure to mitigate was caused by the

13   defendant, for instance, if Ms. Fournier was less likely to

14   obtain substantially similar employment because she had been

15   terminated from her last job.

16        The burden is upon the defendant to prove, by a

17   preponderance of the evidence, the existence of a substantially

18   similar employment in the relevant geographic area, the

19   unreasonableness of the plaintiff's efforts to mitigate, and

20   the reasonableness of any amount that you subtract from her

21   recovery based upon her duty to mitigate.  Mitigation of

22   damages is the only issue in this case for which the defendant

23   bears the burden of proof.  I remind you that the plaintiff

24   must prove every other issue by a preponderance of the

25   evidence.

1          Now, we're going to go one last time back to the form.

2     On the bottom of page 2, you will see an instruction in bold

3     that says:  If you answered question number 2, back on page 1,

4     "Yes," proceed to question 4.  If you answered question number

5     2 "No," your deliberations are complete.  What that means is

6     that if you have answered the state claim "Yes," then you're

7     going to consider this last question number 4.  But if you

8     answered only the federal claim "Yes," you wouldn't get to

9     question 4.  It's only if you answer that question number 2

10    "Yes" that you would get to this question after consideration

11    of damages.

12          And question number 4 says:  Do you find that

13    plaintiff is entitled to punitive damages?  And there's a place

14    for you to answer yes or no.  Now, I'll ask you to put the form

15    down one last time and we'll talk about that.

16          If you find that the defendant has intentionally

17    retaliated against the plaintiff, you may consider, in your

18    discretion, whether punitive damages are warranted.  Punitive

19    damages are different from compensatory damages.  Unlike

20    compensatory damages which compensate the victim for the harm

21    she has suffered, the purpose of punitive damages is to punish

22    the defendant for outrageous conduct.  Punitive damages are

23    designed to punish a defendant for conduct where the

24    defendant's wrongdoing was intentional and deliberate.

25    Punitive damages may be awarded for conduct that is outrageous

1    as a result of a defendant's malicious motive or reckless

2    indifference to the rights of others.

3           Punitive damages are authorized with respect to the

4    plaintiff's state law claim, but not for her federal law claim.

5    Thus, you may not award punitive damages unless you find that

6    the defendant violated Massachusetts law.

7           The amount of punitive damages is set by law, and it

8    is the responsibility of the court to apply the law.

9    Therefore, while you are to consider whether punitive damages

10   are appropriate, unlike the other categories of damages, you

11   are not asked to decide upon a dollar amount of punitive

12   damages and you should not write a dollar amount of punitive

13   damages on the verdict form.

14          So now we're at Part III, which you'll be glad to know

15   is the shortest part of my instructions.

16          When you go to the jury room to begin considering

17   evidence in this case, the forewoman, Ms. Gregory, will assure

18   that every juror is present during all of your deliberations

19   and that all of the jurors, the forewoman included, will have

20   an equal and full opportunity to participate in your

21   deliberations.

22          All of the exhibits that have been admitted into

23   evidence will be available for you physically.  There is also a

24   large touch screen computer in the jury room upon which you

25   will be able to access the exhibits electronically.  I am told

1    that operating the machine is very simple.  If you have any

2    difficulty understanding the technology, you can access a short

3    tutorial film by pressing a button in the lower left-hand

4    corner of the screen.

5         Once you are in the jury room, if you need to

6    communicate with me, the forewoman will send a written signed

7    message to me.  If you do send a written message to me, I will

8    discuss it with the lawyers for both sides before responding to

9    you.  So please continue your deliberations, to the extent you

10   are able, during the time it takes for me to respond to your

11   question.  Do not stop your deliberations while you wait for a

12   response.  And do not tell me how you stand, either numerically

13   or otherwise, on any issue before you, until after you have

14   reached a verdict.

15        On matters touching simply on the arrangements for

16   your meals, schedule and convenience, you are free to

17   communicate with the marshal orally rather than in writing.

18   You are not to communicate with anyone other than me about the

19   case, however, and then only in writing.

20        I have read to you what is called a verdict form.  A

21   verdict form is simply the written notice of the decision that

22   you reach.  You will have the original and copies of this form

23   in the jury room, and when you have reached a verdict, you will

24   have your forewoman fill in, date and sign the original to

25   state the verdict upon which you agree.  You will then report

1    in writing to the marshal that you have reached a verdict,

2    after which you will be invited to return with your verdict to

3    the courtroom.  Your verdict must be unanimous.  That is, you

4    must be unanimous as to the answer to each of the questions

5    that you answer.

6            It is my practice, absent special circumstances, to

7    allow a jury to recess before dinner and begin deliberation

8    again in the morning of the next regular court day.  In this

9    case that would be next Monday, June 6.

10           It is not quite yet time for you to start

11   deliberating.  I will have a sidebar conference with counsel.

12   You can be at ease for a few minutes, after which I will return

13   with a brief final instruction to give to you before you retire

14   to deliberate.  I will see counsel at sidebar.

15   **(SIDEBAR CONFERENCE BY WHISPER TECH AS FOLLOWS:**

16           THE COURT:  All right.  Counsel, any comments?

17           MR. FLAM:  No comments.  Thank you.

18           MR. HAMPTON:  No comments, Your Honor.  Thank you.

19           MR. GORDON:  No comments.

20           THE COURT:  All right.  Then I am going to give them

21   the final instruction.  It's 11:15, so they won't get lunch

22   right away but they'll start their deliberations and probably

23   will get lunch at around 12:30, I think, 12:00 or 12:30.

24           THE CLERK:  12:30.

25           THE COURT:  12:30.  At which point, if you're going to

1    go to lunch, that would be a good time to go, because we won't

2    get any questions at that point.

3            MR. FLAM:  Judge, just one thing, until what time --

4    just for my family planning purposes, until what time does Your

5    Honor hold the jury?

6            THE COURT:  Well, I'll talk about that after we

7    dismiss the jury.

8            MR. FLAM:  Okay.  Thank you.

9    **END OF SIDEBAR CONFERENCE.)**

10           THE COURT:  All right.  Members of the jury, it is now

11   time for the case to be submitted to you.  You may commence

12   your deliberations.  All of you who are the jury must be

13   together at all times when you are deliberating.  Whenever you

14   need a recess for any purpose, your forewoman, Ms. Gregory, may

15   declare a recess.  Do not discuss the case during a recess in

16   your deliberations.  All of your discussion about the case

17   should occur only while you are all together and your forewoman

18   has indicated that deliberations may proceed.  This should be

19   your procedure so that everyone on the jury will have equal and

20   full opportunity to participate and hear all of what the other

21   members of the jury have to say.

22           You may go to the jury room and commence jury

23   deliberations.

24           THE CLERK:  All rise for the jury.

25   (Jury exits.)

```
 1            THE COURT:  Please be seated, counsel.  I need for you
 2   to wait for the deputy to return so we make sure we have all
 3   the exhibits in proper order.  As you know, we give both the
 4   physical exhibits, plus the electronic exhibits are available.
 5            You need to also give my deputy your cell phone
 6   contact so you can get back here within 10 minutes if we have a
 7   question from the jury.  As I said at sidebar, lunch will be
 8   delivered I think about 12:30.  So that's the time if you're
 9   going to be away at all to be away.  But otherwise you need to
10   be within quick access.
11            What normally happens if the jury deliberates until
12   late afternoon, I don't interrupt their deliberations but I've
13   never known a jury to go beyond about 5:15 before they ask to
14   be excused.  If they do that, I then excuse them.
15            I don't initiate the contact.  But the contact comes
16   at 5:00, sometimes before 5:00, but never very much after 5:00.
17   And I always allow the recess at that time.  So if they get
18   that far, it will be about 5:00, 5:15.
19            MR. FLAM:  Thank you, Your Honor.
20            THE COURT:  Anything else that needs to come to my
21   attention before we recess?
22            MR. GORDON:  Not from the plaintiffs, Your Honor.
23            MR. HAMPTON:  Nothing, Your Honor.
24            THE COURT:  We are in recess until further notice.
25            (Jury deliberations from 11:18 a.m. to 1:54 p.m.)
```

1          THE CLERK:  All rise for the jury.

2    (Court and Jury enter.)

3          THE CLERK:  Thank you.  You may be seated.

4          Madam Foreperson, has the jury agreed upon a unanimous

5    verdict?

6          MADAM FOREPERSON:  Yes.

7          THE CLERK:  Madam Foreperson, would you return your

8    verdict to the court.

9          THE COURT:  The verdict form is in order and may be

10   recorded.

11         THE CLERK:  Madam Foreperson, members of the jury,

12   harken to your verdict as the court has received it.

13         Title VII Claim, Number 1.  Has the plaintiff, Maria

14   Fournier, proven, by a preponderance of the evidence, that the

15   defendant retaliated against her in violation of Title VII?

16   No.

17         Question 2, has the plaintiff, Maria Fournier, proven,

18   by a preponderance of the evidence, that the defendant

19   retaliated against her in violation of M.G.L. c. 149, Section

20   185, also known as the Whistleblower Act?  No.

21         So say you, Madam Foreperson, and so say you all,

22   members of the jury?

23         THE COURT:  Do counsel have anything for the court

24   before I discharge the jury?

25         MR. GORDON:  Not for the plaintiffs, Your Honor.

```
 1              MR. HAMPTON:  No, Your Honor.

 2              THE COURT:  All right.  Then I do want to thank you

 3    jurors for your attention, concern and care in performing your

 4    civic duty over these past two weeks.  And because you have

 5    performed it, justice has been done regardless of the direction

 6    of the verdict.  I hope that you do feel a sense of pride from

 7    your service, because you have performed one of the most

 8    influential and fundamental duties of your citizenship and one

 9    that distinguishes those duties from citizens of most other

10    countries because uniquely in the United States our citizens

11    have a right to a trial by jury of their fellow citizens.

12              So you are excused from further jury duty and

13    dismissed with the thanks of this court, and I hope you all

14    will return to your various walks of life with a better

15    understanding and appreciation of what doing justice in this

16    country is all about.

17              You are discharged, and we're adjourned.

18              THE CLERK:  All rise for the jury.

19    (Jury exits.)

20              THE COURT:  All right.  Be seated, counsel.  Does

21    counsel have anything outside the hearing of the jury for the

22    court before we are adjourned?

23              MR. GORDON:  No, Your Honor.

24              MR. HAMPTON:  No, Your Honor.

25              THE COURT:  Thank you, counsel, for a well-tried case.
```

1    You did your clients a good service, both winning and losing.

2    We are adjourned.

3    (Proceedings adjourned at 1:57 p.m.)

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8            I certify that the foregoing is a correct transcript

9    from the record of proceedings taken June 3, 2022 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    9/2/22

16

17   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
18

19

20

21

22

23

24

25